ROBERT HARGROVE *v.* STATE OF TENNESSEE.

(*Nashville,* December Term, 1954.)

Opinion filed August 2, 1955.

John M. Lynch, of Nashville, for plaintiff in error.

Knox Bigham, Assistant Attorney General, for the State.

MR. JUSTICE TOMLINSON delivered the opinion of the Court.

Hargrove's appeal is from a conviction of murder in the second degree. The testimony in this closely contested case consists of several hundred pages. In considering the assignments of error based upon the testimony, this appellate court must apply the rule that credibility of witnesses and conflicts in testimony have all been settled by the verdict of the jury. This makes unnecessary and, indeed, inappropriate, a detailed discussion of that evidence, pro and con, *Cooper* v. *State*, 123 Tenn. 37, 60-61, 138 S. W. 826, in stating what we conclude the material facts to be as established by that testimony.

Sixteen years prior to this homicide the defendant, then nineteen years of age, secretly married the only daughter of deceased. She was thirteen. The resentment of deceased, who was a harsh man, was deep and long abiding. The first year of their marriage this bride and groom lived apart, she living in the home of her mother and father. It is evident that defendant thinks this was

at the insistence of his wife's father, and it was. Her first baby was then born. Thereafter, at the suggestion of the father, and because he thought the care of his daughter's family was too much for her, she and her husband, the defendant, were invited to the home of deceased where they lived for several years. During this time the deceased went to live with his sister, because he wanted no contact with defendant.

This couple and their children then went to their own home procured by the unusual and commendable industry of defendant, and lived continuously thereafter in this, and, then, a second home, until this homicide. During this interval, deceased evidenced paternal solicitation for his daughter and her children. On numerous occasions he carried food in substantial quantities to their home, and on other occasions gave her household articles of value. And in the course of time, his attitude towards defendant became friendly to some extent, at least.

The record makes it quite clear, however, that he, the deceased, was resented by defendant. The defendant says that the deceased "set up a habit of minding my business, as well as others. In other words, he meddled in all people's affairs" and advised the defendant that he, the deceased, was "the law". The defendant said he told his father-in-law that "before you go to running my home, please go and run your own. * * * I asked him not to come back to my house or intervene—I told him 'don't come out there when I am not there because you are trying to tear up my home''. He says he was told by deceased that "I'll kill you and get by with it". Deceased was a lawyer.

On the morning of January 1, 1954, the wife of defendant attended church services, then had lunch down town with her father, with whom on this occasion she

visited for probably two hours. This father later saw the defendant that afternoon and told him of this lunch and visit.

When defendant returned home at the end of that day's work there followed a bitter quarrel with his wife. The record does not make at all clear a plausible reason for such quarrel. She started to leave, taking the children with her. Pursuant to his threat to burn the home if she left, he did set fire to a window curtain, and put it out. He followed her into a neighbor's yard where she and some of the children had taken refuge in a neighbor's car. In trying to get to her he broke the glass from the window or the door of the car which she had locked from the inside. After spending an hour or more at this neighbor's home she, with her children, returned home.

On the next morning after the defendant had gone to work she took their five children, their clothes, and perhaps other articles, to the home of deceased. When defendant returned home that evening and found his family gone, he drove to his father-in-law's home. His wife met him at the front door.

In the ensuing conversation between the two on the front porch, defendant insisted that she and the children go home with him. She as persistently refused, saying that she was afraid of him. During such conversation her father, the deceased, appeared at the door. There was a pistol in his hip pocket. At his direction, his daughter stepped back into the house, and the remainder of the conversation between the three occurred with the screen door closed.

In that conversation deceased told defendant to leave the premises of the deceased and, according to the daughter's testimony, to return the next morning for a discussion with his wife of the differences between

them. It was then after 7 P.M. When defendant declined to leave he stated that he would have to call the police, and started to the phone.

The defendant for a logical reason, had, some weeks before, placed his rifle in the tool compartment of his automobile, where it had remained. When deceased started to the phone the defendant started for his car parked on the street in front of the house. His wife says that as he turned to go to the car he said that he would kill her father if he called the police; and that she, realizing that the rifle was probably in the car, advised her father that her husband had gone to his car for a gun. The father thereupon pulled his pistol from his hip pocket, and had it pointed towards the front door while engaged in the act of putting through the call to the police.

Defendant, having procured his rifle, 22 calibre, from the car, returned with it towards the house. In seconds thereafter, and while the deceased was still at the phone, this rifle, in the hands of defendant, was fired through a window at the side of the house into the body of deceased, killing him instantly.

Immediately thereafter defendant went to the rear of the house where he says that he was ordered by his wife from an upstairs window to go home. She says that he aimed the gun at her. However that may be, the sirens of the approaching police cars became audible, and he went home, and from there to the police station for surrender.

He made no inquiry before leaving as to the effect of the shot which he knew had come from his rifle. When cross-examined as to why he went from the side window to the back he said it was only because he "just wanted to see where my children were". And when cross-examined as to whether deceased was "doing a single, solitary

thing to you when you took his life." he replied that "he took my children away, and—he had a gun with which to kill me". The deceased held his pistol in his hand when the police found his dead body there by the phone.

The defendant's insistence is that the shooting was an accident. His version of the affair is when he saw a gun in the hand of the deceased, who had threatened to kill him, he ran to his automobile for his own safety, but dared not drive off because the street lights fully lighted that space for some distance. Hence, having procured his rifle for his own protection, he returned towards the house and ran to its side to the end that he might be hid by darkness. Then it was, he says, that he stumbled over a bush, rock or rough place in the yard, and the barrel of his rifle struck, and broke through, the glass of the window and, in some way, there was fired the shot which killed deceased.

An autopsy was performed by Dr. Core at the instance of the District Attorney General's office. The testimony of Dr. Core is that deceased received two wounds, one entering the rear of his shoulder; the other the base of his skull. The bullet inflicting the shoulder wound was not found, but traces of its lead were disclosed by the x-ray. In as much as it was not a serious wound the doctor did not pursue his search for the bullet. The bullet entering the base of the skull was disclosed by the x-ray.

Defendant says that only one shot was fired. The excited wife of the deceased heard only one. Defendant's wife says she heard two, one almost immediately after the other, and that it was after the firing of the second shot that her father's body slumped against her. She then ran upstairs to see about her children, and saw the defendant in the back yard.

Defendant's rifle was a single-action bolt rifle. It required reloading by hand after each shot by first pulling the bolt back, thereby ejecting the fired shell, then slipping a cartridge in the barrel. Such action, in its very nature, would cause the barrel of the gun to be lifted or lowered during reloading.

There is a hole much larger than a bullet of a .22 rifle in the window glass which was likewise cracked by the blow received. At the top and bottom of that hole, respectively, there is a small hole which the State says was caused by separate bullets. The defendant says that the little hole at the top must have been caused by the sight of the rifle as its barrel fell against and through the window-pane while the defendant was stumbling in the dark sideyard.

The material facts being as thus stated, perhaps the first alleged error which should be considered is this:— According to the State's evidence two shots were fired. This is inconsistent with defendant's insistence that the shooting was an accident. No bullet was found in the shoulder wound. Tracings of lead were. In this situation, defendant says that the failure of the State to consider whether two bullets were in the body constituted a breach of duty which may have been very detrimental to defendant; that if granted a new trial he will ask the State to cause an autopsy to be performed to ascertain "whether there are two bullets in deceased's body".

The uncontradicted evidence is that there were two separate wounds in the body of Mr. Greene. This evidence was developed early in the trial. The defendant could have asked for an autopsy at that time, as well and as effectively as he could if a new trial should be granted. To grant a new trial under these conditions would amount

to nothing less than to allow the defendant to gamble and when the gamble loses, to be given a new trial.

About the same situation is presented by the assignment of error based on these facts, to-wit:—The defendant's wife had testified to numerous whippings of her by the defendant during the course of their married life. She was vigorously pressed on cross-examination about this, and in the course thereof was urged to name one person to whom she had related any such behavior on the part of the defendant. In response she named Dr. Nelson, her attending physician. An instanter subpoena was demanded by defendant's attorney. The Court replied "I'll give it to you at the proper time". This incident is assigned as error on the allegation that the summoning of Dr. Nelson on some subsequent date might have been of no avail because, so the defendant insists, his testimony might have been influenced in the meantime by others.

No exception was taken to the action of the Court on the application for this instanter subpoena, nor was Dr. Nelson ever summoned by any one. The incident occurred in the fairly early stages of the presentation of proof by the State. Had Dr. Nelson been in the next room, it would have been most extraordinary and out of place for the Court to have disrupted the usual procedure and put Dr. Nelson on the stand at that point. This insistence has no merit.

In the motion for a new trial it was alleged that on certain days officers who were not sworn were substituted for sworn officers to guard the jury. No evidence whatever is offered to support this allegation. We are precluded at the very beginning, therefore, from considering this insistence. A "motion for a new trial is nothing but a pleading, and cannot be looked to as

establishing facts that it alleges''. *Overton* v. *State,* 165 Tenn. 575, 579, 56 S. W. (2d) 740, 742.

■ In the same condition is the assignment of error based on an allegation in the motion for a new trial that the defendant, after the trial had ended, learned that an envelope was delivered to Mr. Crotts, one of the jurors, while the trial was in progress, and that defendant does not know what communication may have been in that envelope. This allegation was supported only by the affidavit of a reputable lawyer of the Nashville Bar. His affidavit is to the effect that a day or more after the trial was over one of counsel for defendant informed him that he, the counsel, had been informed of this communication but that the defendant didn't know about it until after the trial was concluded. That thereupon he, the affiant, told this lawyer for the defendant that he, the affiant, likewise had seen the passage of this envelope to this juror by one of the Court officers during the progress of the case.

There is no affidavit of the defendant that he did not witness this incident. He did not sign the motion for a new trial. Nor is that motion verified. There is no affidavit of any of the attorneys for the defendant that such attorney did not witness this incident. For lack of each of these affidavits the law requires the rejection of this insistence. *Ross* v. *State,* 130 Tenn. 387, 393-394, 170 S. W. 1026.

A new trial is sought by reason of the happening of each of the following incidents:—

*(1).* Near the close of the trial on the first day, and in response to the Court's inquiry as to whether the State might call a ''short witness'', the attorney general replied that he was afraid they ''would be there until day after to-morrow if the cross-examination of all of

my witnesses is going to be as long as this widow's.''
The Court informed him in the jury's presence that defendant had a right to ''cross-examine as long as they kept within the record.''

(2). During the course of the cross-examination of defendant's wife, counsel pressed her as to why she did not live with her husband during the first year of their marriage. She referred to her age as being thirteen and to the law of her Church to the effect that a marriage was not considered as existing ''in the eyes of the Church'' in cases of a girl under fourteen years of age. Being pressed upon the matter she said ''you should know the Church law, you're a Catholic''. The spectators applauded, and were at once admonished by the Court.

(3). It was shown in the evidence that the children of defendant were with their mother in their grandfather's home when this homicide occurred. The oldest were fifteen and thirteen years of age, respectively. As the State approached the close of its case the district attorney said in the presence of the jury that he had thought these ''two children would be used as witnesses for the State but,—''. Thereupon the jury was excluded. Considerable colloquy followed wherein the Court said that the extent to which the district attorney might go in this matter was to say to the jury that he had these two children as witnesses but had decided not to use them. That is the remark which the district attorney made to the jury upon its return. Apparently the district attorney was anticipating, and trying to head off, an argument that because of his failure to use these children a presumption must arise that their testimony would have been unfavorable.

Assuming error as to each of the insistences made in this group, nevertheless, we are forbidden by Code Section 10654 to grant a new trial by reason thereof,

because it does not affirmatively appear that either of them was harmful.

With reference to the remarks of the district attorney about not using the children, the result, if any, could very well be considered a result in favor of the defendant.

■ Complaint is made as to certain remarks made in the final argument of the district attorney. This argument is physically in the transcript. It is not, however, in the bill of exceptions. This complaint cannot be considered.

■ As to the insistence made with reference to the preponderance of the evidence, the mere recital of the facts rejects, per se, any possibilty of a conclusion that the evidence preponderates against the jury's finding that an unlawful homicide was committed.

It is said, however, that if the homicide is found to have been unlawful, still, the evidence will support only a verdict of voluntary manslaughter in that it discloses the defendant, so he says, to have acted upon a sudden anger without malice, this anger being generated by the threats of the deceased while defendant was talking to his wife on the porch coupled with "the many years of provocation and interference by deceased into defendant's affairs".

■ It is a fact that defendant was quite angry at the time he shot his father-in-law. But anger, in order to reduce an unlawful homicide to the degree of voluntary manslaughter, must be anger produced by an adequate provocation. *Freddo* v. *State,* 127 Tenn. 376, 382, 155 S. W. 170, 44 L. R. A., N. S., 659. Does the evidence fail to reasonably support the jury's conclusion that the provocation was inadequate to so reduce the degree of this unlawful homicide?

The evidence makes it clear beyond reasonable controversy that the act which aroused defendant to homicidal anger toward deceased was the phone call by the latter to

the police because defendant refused to leave the premises of deceased, though directed so to do by the latter. When deceased then said that he would have to call the police, the reply of defendant, according to Mrs. Hargrove, was that he would kill him if he did. The fact is that when Greene started to the phone Hargrove rushed to his car, procured his rifle, rushed back and fired at Greene while the latter was still engaged in conversation with a police official.

Greene was acting within his rights in directing Hargrove to leave his premises. Hargrove was wrong in refusing. Greene was right in thus calling the police instead of resorting to physical efforts to eject Hargrove. Such being the case, the Court cannot say that there was no reasonable basis for the jury's finding that the provocation was inadequate to reduce the degree of the offense.

For the same reason, the Court is unable to hold that the maximum punishment of fifteen years confinement is ''so excessive as to indicate prejudice, passion, and caprice on the part of the jury''.

Affirmed.