Charlie Lester

*v.*

State of Tennessee.

370 S. W. 2d 405.

(*Knoxville,* September Term, 1962.)

(May Session, 1963.)

Opinion filed July 15, 1963.

O. W. McKenzie, Dayton, for plaintiff in error.

340

George F. McCanless, Attorney General, Lyle Reid, Assistant Attorney General, Nashville, for the State.

Mr. Chief Justice Burnett delivered the opinion of the Court.

This is a homicide case, wherein a father was convicted of shooting his son. The sentence by the jury was that the father serve ten (10) years in the State penitentiary, from which conviction an appeal has been seasonably perfected and ably argued before the bar of this Court. After carefully reading the record, studying the authorities, etc., we now have the matter for disposition.

The following well worded paragraph from the State's brief is amply supported by the factual situation herein, which was apparently believed by the jury. The Assistant Attorney General says:

"Four members of the same family were principals

in a violent episode, primed by paternal dereliction, filial resentment, brotherly affection, and precipitated by drunkenness and disobedience, which 'occurred on the mountain' in Bledsoe County, early in the night of July 9, 1961, in which Charlie Lester murdered his grown son, Quentin.''

When we had read the brief on behalf of the plaintiff in error, our mind was very much in doubt as to whether or not this conviction should be sustained. The forceful argument and marshaling of the facts on behalf of the plaintiff in error almost convinced us that the case should be reversed. After reading this brief and the State's brief, we have very carefully read the record, and after reading the record our thought has been completely reversed from the feeling that we had after reading the brief of the plaintiff in error. The reason for this is that the brief of the plaintiff in error, and the marshaling of the facts therein are summed up by the plaintiff in error almost solely and alone on the evidence as presented by the plaintiff in error himself when he took the stand in defense of the charges made against him. When we read through the evidence of the son and the daughter-in-law, both on direct and cross-examination, we are convinced that clearly the factual situation that developed made a question entirely for the jury. All defenses of the plaintiff in error are completely and sufficiently covered by this factual situation so as to clearly show that no error has been committed by the trial court against the plaintiff in error.

On Sunday, July 9, 1961, the older son, Quentin, who was the boy who was killed, and his wife Ada left the home of the plaintiff in error where they had been residing for a short time and went to church. The younger son, Glenn,

a boy about sixteen years of age joined them at church. The young boy, Glenn, had been away from home since Thursday on a camping and fishing trip, and joined his brother and sister-in-law at this church. These parties stayed at the church through church services that night and arrived at the home of the plaintiff in error shortly after 9:00 p.m. on the night of July 9, 1961. The jury could and did believe apparently—we are so convinced after reading this record—that when these parties arrived at the home of the plaintiff in error on this Sunday night they found him sitting at the kitchen table and apparently in a partially intoxicated condition. At least in such condition that he was rather fussy and adament. He made certain apparently sarcastic remarks to them about staying away all day and that he had had to stay at home and work (he had been plowing a field all this Sunday) and that they had not come home in time to get him anything to eat. As a result of this Quentin, the murdered boy, made some remark to his father and his father immediately got up and jumped on Quentin physically throwing him to a couch and was in a position of apparently choking this boy when the younger boy, Glenn, picked up a shotgun, which was standing in the corner of the room, and hit his father over the head with the butt of this shotgun. The plaintiff in error takes the position that Quentin attacked him while they were both standing up, and that he was merely holding his son's hands on his breast at the time he was hit over the head by this young boy.

As soon as the boy hit the father over the head the father rolled off Quentin, and Quentin jumped up then and called his wife to get their clothes and they immediately left. The younger son ran out of the house and hid in the weeds somewhere, or in a field nearby. The deceased

son and his wife then got in their truck, and after some backing started off down the road, when a shot was fired from above them and went through the glass of the truck and up through the head of Quentin, lodging in the top of the truck. Quentin then fell over on his wife, the truck still going, but it ran into the mud or a slight bank which was there, and they finally got it straightened out. She then started to drive and take her husband into Pikeville to the hospital. When they got there he was dead, having been shot in this way.

The younger boy testifies that from the place where he was hidden out in the field near the house that he saw the father go in the house and turn the light on apparently looking for a gun and then he came back out and stood at the corner of the house and fired these shots towards the truck, thus we have direct evidence that shots were fired from the corner of the house, and clearly the jury from this had direct evidence from which they could conclude that the father fired these shots. After this was done then the father went to his truck which was an older model and was sitting there near the house, too, and tried for some time to get it started (apparently the motor was out of it and in a tractor nearby). He admits on his examination he had to get the motor out of the tractor and put it in the truck, and then he got it started and, as he says, drove away. First he was going to a neighbor's who lived a mile or so from his house, and then while he was driving down the road on the way to have his wounds dressed he met the Sheriff coming up the road. The Sheriff was coming to arrest him. The cars were stopped and the plaintiff in error got out and got in the Sheriff's car. They took him to the hospital and treated his wounds and there informed him that his son had been shot and he was charged with

this and they placed him in jail. This about covers the factual situation as to what happened there on this July night in 1961.

There are a number of assignments of error, which will not be taken up by us seriatim, but all will be covered in the course of this opinion. A number of the assignments relate to the facts and argue, as said in the outset hereof, very forcefully that the evidence preponderates in favor of the innocence of the plaintiff in error and against his guilt. The main insistence is to the effect that there is only circumstantial evidence before the jury and that this is not sufficient to justify a conviction. In making this contention though the plaintiff in error overlooks the direct testimony of the young son, Glenn. This witness, as said above, testified that as the deceased and his wife were driving away he heard his father call from the corner of the house, "wait, wait", and saw the flash of this pistol or gun (the boy says it was a pistol) and its report at the same location, saw the truck run off the road, and heard deceased's wife scream. Of course, this is positive evidence of the homicide.

■■ The next proposition of the plaintiff in error is that the State's witnesses were telling a falsehood about this and that actually the young son Glenn, shot the deceased. The plaintiff in error on his examination does not say so but the whole gravamen of the cross-examination of the various witnesses and the innuendo attempted to be made from the whole thing is that this boy, Glenn, thinking that it was his father who was driving off in the truck shot at his father with a .22 rifle and killed his brother. The argument likewise is made that the person who fired the shot was above the truck and was shooting at an angle down and that the bullet going through this

glass ranged up to hit the head of deceased and was lodged in the top of the truck and thus would have had to come from where the boy was located down in a field rather than coming from where the father was standing above the truck. Of course, the very obvious explanation of this fact is that when the bullet struck the deceased's skull it deflected slightly so that it came to rest in the top of the truck. All these facts, about where the boy was located, where the father was located, how the truck was located, were before the jury with certain pictures of the trucks and the house and grounds, and a very careful examination and cross-examination of these witnesses as to these locations were all before the jury and that body, as has been said literally thousands of times, were in a far better position to determine just exactly how this factual situation was than we are. This statement is particularly emphasized in this case when a witness would give an estimate of the distance of this and that to such an extent that it would take the jury, who was there and saw and heard him make these measurements and things, to determine just what the truth of the situation was. We certainly couldn't tell anything about it from reading this record. Then, of course, the settled principle of law is that the jury determines the credibility of the witnesses. Of course, determining their credibility really means that the jury has concluded that one witness has told a story which meets the test of plausibility and thus it is therefore credible. From reading this record we agree with the conclusion of the jury, because the State's witnesses seem to us to have told a more plausible story.

██ It is next insisted that the trial court erred in refusing to permit the plaintiff in error to state his conclusions in regard to what would have been the course

of a bullet fired from a .357 Magnum pistol into the back of the truck. Such a question calls for an answer based upon expert knowledge of the particular firearm, the angle at which the bullet struck the truck, the properties of the window glass and the metal body of the truck, the angle at which the bullet struck the deceased's skull, and other matters purely concerning ballistics. Plaintiff in error did not even attempt to qualify as such an expert. The only possible thing that he did is to say that he would shoot this pistol through a log or a tree or motor of a car or something of that kind, and it was clearly on this basis that the trial judge sustained the objection to his attempting to give an opinion on this matter. The record shows what different non-experts said such a gun would do, and it was entirely up to the jury, seeing all these witnesses and knowing these facts as presented to them as to what it would have done in the absence of expert testimony.

At the conclusion of all the evidence and the charge of the court to the jury counsel offered an instruction with regard to insanity, which the trial judge refused to give. It was the theory of the plaintiff in error and he so stated on his examination that after he was hit in the head by his son with this shotgun he became unconscious and didn't remember a thing in the world that he did until he was driving off to a doctor. Of course, it is well settled that the accused was entitled to an affirmative instruction upon every issue raised by the evidence. This though does not require the court to instruct on matters not raised by the evidence. The only evidence in this record with regard to this mental condition is the testimony that he was knocked out when hit on the head and from that time he didn't remember what happened. It is elementary

that insanity and amnesia are distinct conditions, even though amnesia sometimes is an incident to insanity. Insanity is the incapacity to discriminate between right and wrong, and amnesia is simply the inability to remember. There is not a scintilla of evidence in this record indicating that the plaintiff in error was insane. There is no evidence as to the effect of loss of memory upon the mind of the plaintiff in error at the time of this act. The plaintiff in error was taken to a doctor by the Sheriff who treated him sometime after the act and there is no testimony of the physician in regard to his mental condition at the time, and there is nothing to show that the accused didn't know right from wrong. This proposition was in effect answered by this Court in *Thomas v. State,* 201 Tenn. 645, 301 S.W.2d 358, and this Court in that case, the opinion written by former Chief Justice Neil, said:

"* * * amnesia, in and of itself, is no defense to a criminal charge unless it is shown by competent evidence that the accused 'did not know the nature and quality of his action and that it was wrong.' "

The Court likewise approved a statement from a medical text, as follows:

"Failure to remember later, when accused, is in itself no proof of the mental condition when crime was performed."

Aside from this proposition we think that the charge given by the court, as found on page 160 of the transcript, was correct and really left it up to the jury as to whether or not such unconsciousness and things as claimed by the plaintiff in error did happen, when the court charged that if at the time the shooting occurred "he was uncon-

scious and did not have a gun and therefore could not have shot him'' or if the jury had a reasonable doubt as to his guilt on this question they should acquit the plaintiff in error and the verdict should be not guilty. In other words the jury had all these things before them and under the charge of the court if they had a reasonable doubt as to the fact that the plaintiff in error got this gun and did this shooting while in such a condition they should acquit him.

Then another assignment is made in which the theory of the plaintiff in error as given to the jury by the court is attacked as violating Article 6, Section 9, of our Constitution to the effect that the judge shall not charge the jury with respect to matters of fact. This theory of the plaintiff in error as set forth by the trial judge was clearly not a comment on matters of fact, but was stating to the jury the clear inferences and factual situation as drawn from the testimony of the plaintiff in error and cross-examination of other witnesses by the counsel of the plaintiff in error, and it is in this charge that what we have referred to immediately above about being unconscious, etc., is given. In other words the clear inference all the way through is that the man did not shoot his son, but if it was done it was done by the boy shooting at the father and that then if the man did do it he was unconscious and didn't know he did it. Clearly, if such a theory was not given by the trial judge in this case an error would now be assigned for that reason. As we see it this was not prejudicial.

Assignments are also made and very forcefully argued that the trial judge would not allow cross-examination of the young son, Glenn, trying to show Glenn's animosity towards his father and that Glenn did the

shooting rather than the father. The quotation made in the brief of the plaintiff in error and the assignment of error where this objection was sustained and the statement made by the trial judge comes after long examination and cross-examination which to every extent could and did give the jury an opportunity to determine these factual questions. Apparently the trial judge felt that this had been going on long enough and really was stopping a repeated examination to try over and over again, as is frequently done by counsel, to emphasize their point. The trial judge clearly did not abuse his discretion in disallowing further testimony on this question.

The interesting and new, as far as we know, question presented by this case is presented by the sixteenth assignment wherein it is charged that reversible error was committed because the motion for a new trial was heard at Dayton, Rhea County, Tennessee, rather than in Bledsoe County where the crime was committed and where the case was tried. No authorities are cited one way or the other on the proposition. The argument basically of why this is error is that Article I, Section 9, of the Constitution of Tennessee is violated. This Article requires the accused to be tried in the county where the crime was committed. A very closely related question to this, and one we think requires the same reasoning to determine a correct answer, was considered by this Court in *Cisco v. State,* 160 Tenn. 681, 28 S.W.2d 338, wherein this Court held that the Constitution does not require that the accused be present on a hearing of a motion for a new trial because the hearing of a motion for a new trial is not part of the trial. This question is annotated (recently) in 69 A.L.R.2d 835, and particularly at 837. The annotator uses this very apt language:

"Most frequently the rationale for this conclusion is that the trial ends when a verdict has been rendered, that any right an accused may have to be present at proceedings following an indictment exists only during the pendency of the trial, that a defendant, once convicted cannot claim the right to be present at the hearing of post-verdict motions."

We accept this reasoning and think that it is logical, fair and a complete answer to this question.

This case has been exceptionally well argued and briefed by both sides, and after a thorough consideration of the entire matter we are satisfied that there is no reversible error herein, that the plaintiff in error has had a fair trial and has been well represented. It thus became our duty to affirm the judgment below.

### On Petition to Rehear

Counsel for Lester has filed herein a very forceful, courteous and dignified petition to rehear.

After very carefully reading and studying this petition to rehear and the authorities therein cited, we find that it is primarily a disagreement of counsel with the conclusions we reached in the original opinion on factual situations, which the trial judge and jury had before them and disagreed with the petitioner. We in our opinion very carefully read this entire record and as shown by our original opinion found there were ample facts to support the verdict and conclusions of the jury on these facts. Therefore all questions presented on the petition to rehear wherein the petitioner argues against factual situations are overruled.

In the petition to rehear again the question of the

mental condition, or the momentarily unconscious condition, at the time this act was committed is argued. We are satisfied with the conclusions we reached on this question in the original opinion. The trial judge sufficiently handled this question in his instructions to the jury in his definition of the offenses wherein the lesser offense was included in the greater offense. The indictment alleged various things but these were taken care of in this instruction to the jury and we do not think there is any error on this question.

The main basic question raised on this petition to rehear was raised by Assignment 16 in the original brief and argument before this Court. This question is a question of law entirely and is in effect that error was committed because the trial court sentenced the accused in a county other than the county of venue. We at the time we were working on this case in preparing our original opinion had all authorities before us and carefully read them upon this question. There are no new or additional authorities cited other than those considered by us at that time. After again considering the question on this petition to rehear we are clearly satisfied that we reached the right conclusion upon this question as stated in the last paragraph of our original opinion, beginning on page 12 thereof.

After thoroughly considering the petition to rehear we are satisfied that there is no error therein and the petition must be denied.