Item D.
Storage on equipment from July 1,
1966 to February 28, 1967 200.00

Item E.
Disallowed _____
 Total $14,217.85

Accordingly, an order will be entered in this Court dismissing the suit of Helen Ferrell's School of Cosmetology, Inc., and awarding judgment in favor of the complainants, Helen Ferrell and Buford L. Ferrell, and against the defendant, Clarence E. Elrod, for $14,217.85 plus interest from October 26, 1966, the date of the filing of the original bill, and all costs including costs of this appeal.

Modified and rendered.

SHRIVER, P. J., and PURYEAR, J., concur.

Robert T. SPARKMAN, Plaintiff in Error,

v.

STATE of Tennessee, Defendant in Error.

Court of Criminal Appeals of Tennessee.

Feb. 12, 1970.

Rehearing Denied March 11, 1970.

Certiorari Denied by Supreme Court
Sept. 8, 1970.

James F. Neal, and William C. Wilson, Nashville, for plaintiff in error.

George F. McCanless, Atty. Gen., Robert F. Hedgepath, Asst. Atty. Gen., Nashville, James M. Porter, Dist. Atty. Gen., Springfield, for defendant in error.

## OPINION

OLIVER, Judge.

The defendant below, Robert T. Sparkman, was convicted in the Circuit Court of

Robertson County of (1) unlawfully carrying a pistol, for which he was sentenced to pay a fine of $50, (2) assault, for which he was sentenced to pay a fine of $250 and be imprisoned in the County Jail for 11 months and 29 days, and (3) shooting into a storehouse, for which his punishment was fixed at a fine of $50 and imprisonment in the County Jail for 12 months. The court ordered the two jail sentences to be served concurrently. His motion for a new trial being overruled, the defendant is before this Court upon appeal in the nature of a writ of error duly perfected.

In his Assignments of Error here, the defendant contends, as he did in his motion for a new trial, that the evidence of his insanity at the time of the offenses charged preponderates against the verdicts of the jury and in favor of his innocence, and (2) that the trial court erred in denying his motion for a mistrial, and for a new trial, because the State attempted to impeach him "by eliciting on cross-examination testimony of prior acts of misconduct not amounting to convictions of an offense involving moral turpitude."

■ We dispose of the second Assignment of Error immediately. The record shows that, in each instance of the defendant's cross-examination complained about, the court promptly sustained his objections thereto.

■ In considering the first Assignment of Error, we are bound by the rule, stated and restated over and over by our Supreme Court and this Court, that a jury's verdict of guilt, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in the evidence in favor of and establishes the State's theory of the case. Under such a verdict, the presumption of innocence, which the law accords an accused prior to conviction, disappears and is replaced by a presumption of guilt which puts upon him the burden of showing upon appeal that the evidence preponderates against the verdict and in favor of his innocence. We may review the evidence only to determine whether it preponderates against the verdict and, in doing so, we must take the verdict as having established the credibility of the State's witnesses. The verdict will be disturbed on the facts only if the evidence clearly preponderates against it and in favor of the innocence of the accused. Gulley v. State, 219 Tenn. 114, 407 S.W.2d 186; Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, Tenn.Crim.App., 425 S.W.2d 799; Brown v. State, Tenn.Crim.App., 441 S.W.2d 485.

■ The rule that the credibility of the witnesses and conflicts in the testimony are all settled by the verdict of the jury, "makes unnecessary and indeed, inappropriate, a detailed discussion of that evidence, pro and con, * * * in stating what we conclude the material facts to be as established by that testimony." Hargrove v. State, 199 Tenn. 25, 28, 281 S.W.2d 692, 694; Morrison v. State, 217 Tenn. 374, 397 S.W.2d 826, 400 S.W.2d 237.

We summarize the material evidence. On the morning of December 3, 1966, the defendant and his wife's cousin, one Harley Bradley who lived with them, and another man identified in this record only as the "Kirkham boy," started in the defendant's pickup truck to a wholesale produce establishment in Bowling Green, Kentucky to buy supplies for his restaurant. He also took along two pistols and a double-barreled shotgun which, as he says, he intended to sell to a gun dealer located near the State line.

Enroute they stopped at Lewis Rogers' Shady Park Inn, and the defendant and Kirkham went in for a beer; Sparkman ordered one for each of them and seated himself in a booth. He then approached a table occupied by two other customers and proceeded to crumble one's crackers into his bowl of beef stew. When proprietor Rogers and this customer remonstrated, the defendant said he would pay for it and

gave Rogers fifty cents. When this customer said "something else smart" to the defendant, he slapped the customer in the face. Rogers remonstrated further with the defendant and told him he would have to leave, and he did so.

Shortly thereafter, about noon, the defendant and his companions stopped at the Bryan and Whitson Cafe. They each ordered a bottle of beer, which the defendant paid for. While they were drinking their beer and playing the juke box, co-proprietor J. H. Bryan entered the establishment. At the sight of Bryan, the defendant suddenly pulled a .22 caliber pistol and began shooting. One shot was close over Bryan's head. Thinking that the gun was a toy cap pistol, Whitson told the defendant to put it in his pocket and he did so. Then, seating himself at the counter opposite where Bryan was washing some glasses, the defendant told him "I don't like you. You have trouble with everybody that comes in here. I'm going to shoot you." The defendant then pulled another pistol of larger caliber and began shooting in Bryan's direction; after the first shot, the defendant started crawling across the counter toward Bryan, and the next shot hit the deep-freezer. When Bryan ran out of the establishment, the defendant fired a shot through the cash register, then went outside and got his double-barreled shotgun out of his truck and fired both barrels into the store's two front plate glass windows. He and his companions then got in his truck and left. Two or three days later he returned and made arrangements to pay for replacement of the windows, and paid the bill when the work was completed.

About 1:30 or 2:00 p. m. the same day, the defendant, who was driving his truck, and his companions, again stopped at Lewis Rogers' Shady Park Inn. Rogers had heard about the defendant's shooting spree at the Bryan and Whitson Cafe, went outside when he drove up and told him he would not be permitted entrance on that account, because all his customers then pres-

ent had heard about the shooting and would leave if he went inside. The defendant denied that he had shot up any place of business. When Rogers passed between his automobile and the defendant's truck, the defendant pulled forward and almost pinned Rogers between the two vehicles. Then an altercation occurred between the defendant and two men who came out of the Inn, during which one of them took the defendant's .22 caliber pistol out of his hand after a shot had been fired, and the other man took the defendant's shotgun out of his truck and unloaded it and threw it across the street. Rogers took charge of the shotgun and pistol and turned them over to investigating officers that afternoon. When the defendant started to leave, he bumped his truck into a small fireworks stand on the premises and told Rogers to "Move that car."

Prior to the incidents related above, the defendant had been a patron of both establishments. He had never misconducted himself in any way. Rogers testified that during the morning visit to his establishment, the defendant was not drunk but looked "kinda funny," had a "glazed look" in his eyes, looked "sort of crazy," and "didn't seem to know what he was doing." And Bryan testified that on a former occasion when the defendant brought whiskey into his cafe he took it outside when requested to do so. Referring to the incident at the Bryan and Whitson Cafe, Mr. Whitson testified that the defendant "just seemed to go crazy," acted "like a wild man," "like he was completely unaware of what he was doing," and, although they were friends, "I tried to talk to him and he wouldn't even pay no attention to me."

The defendant testified that he remembered nothing from the time he ordered his second beer at Rogers' Shady Park Inn until he awoke in jail that afternoon, that he suffered a complete lapse of memory in the interim; that he had mental difficulty while in the military service, after falling off of a truck and being hospitalized for 87 days during which he was

given insulin shock treatments and placed in a psychopathic ward for three weeks and was then treated by a psychiatrist; that after return to civilian life he had sought and obtained mental treatment several times, including consultation with and examination by a neurologist and a psychologist, and that subsequently a veterans' hospital diagnosed his condition as "scleroderma" ("A disease characterized by diffuse or circumscribed rigidity and hardness of the skin." Webster's International Dictionary, Second Edition); that his memory had been failing; and that following the events in question he consulted with Dr. Otto Billig at the suggestion of his defense counsel.

Dr. Otto Billig, an eminent and widely known psychiatrist, who had served several years as resident instructor in psychiatry at the Duke University Medical School, is a member of the Psychiatric Examining Board of the American Medical Association and the American Psychiatric Association, and has been an associate professor at Vanderbilt Medical School teaching psychiatry since 1948, and also has engaged in the private practice of psychiatric medicine since 1937, testified that he examined the defendant on December 14 and 21, 1966, for legal evaluation only upon referral by his attorney; that he talked to the defendant about his past life and considered the history he gave; that he also considered the report of a psychologist and a neurosurgeon to whom he sent the defendant for examination; that "scleroderma" is a "thickening of the skin" and does not affect mental conditions; that the defendant "was suffering from a dissociative reaction * * * a type of gross personality disorganization, the basis of which is a neurotic disturbance * * * This is a temporary state that may last from a few minutes until weeks or months. It may last for a few hours. Conditions like· this occur particularly in individuals who show a history of being emotionally unstable"; that, in his opinion, at the time of the acts charged the defendant did not know the nature and quality of his acts nor that they were wrong, and that this condition existed for a period of several hours beginning about 9:30 a. m. on the date in question; that his opinion was "reinforced" by testimony he heard in court during the trial; that the defendant did know right from wrong during his interviews with him; that the defendant told him he had three or four beers but remembered nothing after the second one; and that the defendant was not psychotic, i. e., was not suffering from any mental disease.

■ Of course, it is settled beyond question that the weight and value of expert testimony is for the jury and must be received with caution. Mullendore v. State, 183 Tenn. 53, 191 S.W.2d 149. This applies to the expert opinions of medical men. Crane Enamel Co. v. Jamison, 188 Tenn. 211, 217 S.W.2d 945. Where there is any conflict between expert testimony and the testimony as to the facts, the jury is not bound to accept expert testimony in preference to other testimony, and must determine the weight and credibility of each in the light of all the facts shown in the case. Act-O-Lane Gas Service Co. v. Clinton, 35 Tenn.App. 442, 245 S.W.2d 795; East Tennessee Natural Gas Co. v. Peltz, 38 Tenn.App. 100, 270 S.W.2d 591. Expert medical opinion regarding the functioning of the human body must always be more or less speculative. Patterson Transfer Co. v. Lewis, 195 Tenn. 474, 260 S.W.2d 182; Great American Indemnity Company v. Friddell, 198 Tenn. 360, 280 S.W.2d 908.

■ Insanity and amnesia are distinct conditions, even though amnesia sometimes is an incident of insanity. Insanity is incapacity to discriminate between right and wrong, while amnesia is simply the inability to remember. Thomas v. State, 201 Tenn. 645, 301 S.W.2d 358; Lester v. State, 212 Tenn. 338, 370 S.W.2d 405.

■ Amnesia alone is no defense to a criminal charge, unless it is shown by competent evidence that the accused did not

know the nature and quality of his action and that it was wrong. Thomas v. State, supra; Lester v. State, supra. In Thomas, the late Chief Justice Neil wrote for the Court:

"The subject of amnesia in all its aspects is fully discussed in Attorneys' Textbook of Medicine, 3d Ed., by Gray. Beginning at paragraph 96.01 it is said:

"'Amnesia, loss of memory, may lead to crimes entirely unknown to the culprit at a later date. That is rare. More frequently, an accused, remembering full well what he has done, alleges amnesia in false defense. He is a malingerer. To prove his innocence or guilt may be most difficult.

"'The plots of many novels are based upon amnesia of complex type. The hero or heroine is described as long living a life entirely apart from their true identity. Having all their faculties except a recollection of the past before some fateful day, the story is unfolded usually in close proximity to places and people with whom the individual associated in the past, permitting amusing and hazardous escapes from identification. This goes on for years, with dramatic return to normalcy in the end.

"'There is little reason to believe in real life that such may happen.

\* \* \* \* \* \*

"'The accused may feel with some logic the unfairness of trial for an act he does not remember. His attorney may plead temporary insanity. Medicolegal study is then required to determine the degree of mentality. McNaughten's rulings prescribe the accused can be found guilty but insane at the time of a crime in the event he did not know the nature and quality of his action, or that it was wrong. Failure to remember later, when accused, is in itself no proof of the mental condition when crime was per-formed. An accurate understanding of amnesia is necessary to consider the degree of knowledge possessed by the accused at a specified time in the past.'

"It thus appears from the foregoing authority that amnesia, in and of itself, is no defense to a criminal charge unless it is shown by competent evidence that the accused 'did not know the nature and quality of his action and that it was wrong.'"

■ With respect to the defendant's insistence that he was insane at the time he committed the acts, it is to be remembered that the burden of establishing his insanity was upon him. In Spurlock v. State, 212 Tenn. 132, 368 S.W.2d 299, former Chief Justice Burnett spoke for the Court:

"'Insanity as a defense in criminal prosecutions is a question of fact for the jury to determine under proper instructions by the court as other facts are found.' 14 Am.Jur., sec. 42, page 799. The law presumes sanity, and this being true, obviously the burden is upon the plaintiff in error to show insanity, voluntary or involuntary. Mullendore v. State, 183 Tenn. 53, 191 S.W.2d 149."

Adhering to the McNaghten Rule (McNaghten's Case, 10 Cl. & Fin. 210, 8 Eng. Reprints 722 (1843) as a test of criminal accountability in cases wherein insanity at the time of the crime is advanced as a defense, Mr. Chief Justice Burnett also said in *Spurlock:*

"\* \* \* We, in this State, for nearly a hundred years have followed the view quoted below:

"'The prevailing view, however, is apparently to the effect that the capacity of the accused to distinguish right from wrong in respect of the act charged as a crime at the time of its commission is made the test of his responsibility, and not his capacity or ability to distinguish right from wrong in the abstract. Hence, as a composite

rule, if a person at the time of the commission of an alleged crime has sufficient mental capacity to understand the nature and quality of the particular act or acts constituting the crime and to know whether they are right or wrong, he is responsible if he commits such act or acts, whatever may be his capacity in other particulars; but if he does not possess this degree or capacity, then he is not so responsible.' 14 Am.Jur., sec. 40, page 797.

\* \* \* \* \* \*

"The M'Naghten Rule that is applied in this State, and most other states, is historically and chronologically discussed in the 70 A.L.R. annotation above referred to. Among other things the annotator says of this rule:

" 'Since then the "right or wrong test" annunciated by that case, though condemned as being unscientific and based on fallacious principles by the overwhelming weight of medical authority, has nevertheless been tenaciously adhered to by a great many courts as the only safe standard under which there can be had a proper administration of justice.'

"We agree with this statement."

In *Spurlock,* Mr. Chief Justice Burnett also quoted and expressly adopted the following statements, among others, in the State's brief:

" '\* \* \* Under the rule heretofore followed by this Court, the law permits the introduction of evidence in the form of expert medical testimony in regard to the mental capacity of the accused but reserves the final judgment of legal responsibility to the jury.

\* \* \* \* \* \*

" '\* \* \* Any rule, the practical effect of which is to permit the guilt or innocence of an accused to be determined except by the jury, would be a serious de-

parture from one of the most basic fundamentals of our criminal jurisprudence.' "

Thus the Court in *Spurlock* again recognized and reiterated the well-settled and time-honored rule in this State, heretofore cited, that the weight of expert testimony, as with all other evidence, is at last for the determination of the jury; and that a defendant's mental capacity at the time of the crime in question, where insanity at that time is raised as a defense, is a question of fact for the jury.

Such was the province and duty of the jury in this case. It weighed and considered all the evidence concerning the defendant's acts and conduct on the day and at the times and places in question; it considered and evaluated the conclusions expressed by the lay proprietors of the two business establishments involved, and the opinions of the psychiatrist. By its verdict the jury implicitly said that it entertained no reasonable doubt that, at the times and places of the offenses charged, the defendant well knew what he was doing and knew right from wrong and that his acts were wrong. Upon this record, the jury was fully warranted in so finding. The defendant has failed to carry the burden of demonstrating here that the evidence preponderated against the verdict and in favor of his innocence by reason of insanity.

The judgment of the trial court is affirmed.

This case was heard and submitted before Judge Galbreath became a member of the Court, and prior to enactment of Chapter 330 of the Public Acts of 1969 increasing the membership of the Court.

WALKER, P. J., concurs.

## ON PETITION TO REHEAR

The defendant has filed a courteous and dignified petition to rehear, the material

substance of which is that in its original opinion the Court decided the case incorrectly.

The petition to rehear clearly states that we fairly recited the material evidence introduced at the trial of this case and that we considered the defendant's Assignments of Error.

 A petition to rehear which points out no matter of law or fact overlooked by the Court, and only seeks to reargue matters which counsel insists were improperly decided, presents no ground for a rehearing. The office of a petition to rehear is to bring to the attention of the Court matters of law or fact improvidently overlooked, not matters which counsel supposes were decided incorrectly. City of Paris v. Paris-Henry County Public Utility District, 207 Tenn. 388, 340 S.W.2d 885; Flippen v. State, 211 Tenn. 507, 365 S.W.2d 895; Sims v. State, Tenn.Crim.App., 448 S.W.2d 93; Rule 32, Rules of Supreme Court of Tennessee.

This petition must be denied.

WALKER, P. J., concurs.