Hugh P. LEE, Petitioner,

v.

Vinson THOMPSON, Warden, Tennessee State Penitentiary, Respondent.

No. CIV–1–76–318.

United States District Court, E. D. Tennessee, S. D.

April 19, 1977.

Judgment affirmed, 6 Cir., 577 F.2d 741.

Robert J. Shockey, Shockey, Boehm & Pinchak, Chattanooga, Tenn., for petitioner.

David L. Raybin, Asst. Atty. Gen., Nashville, Tenn., for respondent.

## MEMORANDUM

FRANK W. WILSON, Chief Judge.

This case is presently before the court upon a petition for writ of habeas corpus filed by petitioner pursuant to 28 U.S.C. § 2254 and upon a motion by the respondent to dismiss or, alternatively, for summary judgment. The petitioner seeks to set aside convictions for murder and felonious assault in Criminal Cases Nos. 125,824 and 125,830 entitled "State · of Tennessee v. Hugh P. Lee," in the Criminal Court of Hamilton County, Tennessee, and is presently in the custody of the respondent, Warden of the Tennessee State Penitentiary, Nashville, Tennessee, serving consecutive sentences of fifty and six to twenty-one years upon the aforesaid state court convictions. Having adequately exhausted his state court remedies, the petitioner has filed a petition for a writ of habeas corpus in this court upon the grounds that his convictions are unconstitutional. Specifically, the petitioner contends that his state court convictions were entered in violation of his right to due process in that the state failed to introduce sufficient evidence to prove that petitioner was sane at the time of the crime. Upon consideration of the issue raised in the petition, it would appear that this issue may be disposed of under the present state of the record, which includes the record of the state court proceedings, without any further evidentiary hearing.

The evidence shows that on July 5, 1973, the petitioner, hereinafter referred to as the "defendant", shot and killed his wife, Judy Ann Lee, and wounded her former husband, Dale Kevin Fariss. The defendant and the deceased were married on April 19, 1973, lived together for two months and then separated. At the time of the shootings, the defendant and his wife were contemplating a divorce. Two days prior to the shootings, they had signed divorce papers and a property settlement agreement.

Apparently, the short marriage of the defendant and the deceased had been plagued by difficulties. Mrs. Frances Richards, mother of the deceased, testified that the defendant had a bad temper, and on one occasion threatened the deceased, saying, "She's going to cause me to kill her and kill somebody and I'll have to serve the rest of my time in the penitentiary."

On July 5, Dale Fariss came to visit his ex-wife, Judy Ann Lee, and a small son who had been born out of their former marriage. Fariss and his ex-wife, the deceased herein, had planned to take the baby with them and spend a day at the lake; instead, due to the hot weather, they left the child with the deceased's grandmother.

The defendant appeared at the deceased's grandmother's house about 3:00 p. m., and on learning that his wife was out on the lake, went to the Sportsman Store in Dalton, Georgia, and purchased a .38 caliber Smith and Wesson revolver and a box of ammunition. He then went to the lake, apparently in search of his wife. On his arrival at the dock, he persuaded some acquaintances, James and Jackie Barton, to take him out on the lake in their boat. Approaching the boat occupied by Fariss and Mrs. Lee, the defendant fired his pistol six times at them, wounding Fariss in the leg. The defendant returned to the shore, walked to his automobile, reloaded his pistol, and went back down to the pier, by which time Fariss and Mrs. Lee had re-

turned to the dock. The defendant then fired his pistol at them five times, killing Mrs. Lee and further wounding Fariss. The time of this last shooting was about 4:30 p. m. The defendant threw the gun in the lake and sat down on a bench. Shortly thereafter, police officers arrived and arrested the defendant. Later that evening, the defendant confessed to the police officers and admitted his participation in these events.

The foregoing facts are not materially disputed by the defendant. His theory was that he was insane at the time of the shootings, and was mentally incapable of formulating the requisite specific intent to commit the crimes and thus he should not be held responsible.

The defendant's attorney had the defendant examined by a psychiatrist, Dr. Sottong. At the insistence of the State, the defendant was also examined by Dr. Cheatham, another psychiatrist. Both psychiatrists testified and stated that in their opinion the defendant was suffering at the time of the shootings from a mental disease termed "dissociative reaction". Dr. Cheatham described the ailment in this manner:

"Dissociative reaction is perhaps best described as a splitting or a dividing of the stream of mental activity in a person, whereby a person under a great deal of stress or emotional tension may behave in a quite autonomous, quite automatic way, and perform perhaps a number of acts for which they have no subsequent recall or very little subsequent recall, and for which, over which they really have no conscious direction or control."

Dr. Sottong testified that the major symptoms of a "dissociative reaction" are amnesia, fugue [a type of amnesia], somnambulism [sleep-walking], and multiple personality.

The doctors testified that in their interviews with the defendant, they discovered that he could recall in detail most of the events leading up to the shootings, and could also recall a few of the details of the shootings and events immediately thereafter, but in less detail. Dr. Sottong ventured

his opinion that the defendant was in control of himself until he first saw his wife and Fariss in the boat, but during the events immediately following, he was suffering under the ailment described and thus he was not responsible for his actions. Dr. Sottong was unable to state how long after the shootings the defendant continued in this mental state.

Both psychiatrists testified that one of the characteristics of a person in a dissociative reaction state would be that of appearing normal to the casual observer. In the opinion of Dr. Sottong, the defendant, at the time of the shootings, did not have the capacity to distinguish right from wrong. Dr. Cheatham testified that the defendant may have possessed sufficient mental capacity to distinguish right from wrong, but that his capacity to do so was impaired by reason of his emotional state. Later in his testimony, Dr. Cheatham stated that from his examination, he did not know whether the defendant had sufficient mental capacity to distinguish right from wrong at the time of the shootings. No other psychiatric testimony was received at the trial, although a number of lay witnesses did testify.

Mrs. Winfred Claiborne, owner of the Sportsman Store, testified that when the defendant came in between 3:00 p. m. and 3:30 p. m., he was quite calm, and that he completed a form for the purchase of the pistol. On this form the defendant listed his address, date of birth, height, weight, and other personal background data. In addition to other questions, he answered that he had never been adjudicated mentally defective and had never been in a mental institution.

Dorothy Poe, witness for the State, described the defendant's actions immediately after the shootings at the dock as angry but otherwise very deliberate.

Another State's witness, Charles Patterson, a salesman, testified as follows:

"Q All right. Did you watch him after he had shot her?

"A  Yeah, he pitched the gun out in the lake, and somebody standing up with me said, 'Well, we'll stop him now.'  And he come back up to the bottom of the steps and done his hands like that and he said, 'I'm not going to cause you no trouble,' said, 'You can call the cops or whatever you want to do.'  He said, 'I come up here to kill 'em both and that's what I done.'  And he said, 'Nobody's going to steal my wife and my boat, too.'  By that time some other people was around, and he sat down on a bench there."

Trooper Fred Mullins testified that when he arrived on the scene, he had no problem communicating with the defendant; that the defendant was "rational", that he had a "little liquor on his breath, but he was in control of his senses as far as I was concerned," and that the defendant said that he "had done what he come there for".

All of the witnesses who either saw or talked to the defendant prior to, during, and following the shootings testified that the defendant was rational and appeared to be normal.

Additionally, the parents of the deceased and the attorney who had prepared the defendant's divorce papers two days prior to the shootings, all testified that the defendant appeared to be normal on the occasions they had seen him.

Marty Brown, who took the defendant's oral confession at 9:50 p. m. the day of the homicide, testified that he had no problem communicating with the defendant.  The defendant described to him in minute detail the occurrences leading up to the incident, and related the details of the shootings and the aftermath thereof.

Relying upon the case of *United States v. McGraw*, 515 F.2d 758 (9th Cir. 1975) the defendant contends that since both psychiatrists who testified in the trial agreed that the defendant was suffering from "dissociative reaction" and was therefore mentally incompetent at the time of the offense and there was no expert testimony to the contrary, the jury impermissibly based their verdict upon lay testimony to the contrary, thereby denying the defendant due process of law.

■  Generally speaking, the sufficiency of evidence to sustain a conviction in a state court prosecution is not reviewable in a federal habeas corpus proceeding. *Brooks v. Rose*, 520 F.2d 775 (6th Crim. 1975); *Ballard v. Howard*, 403 F.2d 653 (6th Cir. 1968).  However, a conviction which is totally devoid of evidentiary support as to a crucial element of the offense is unconstitutional under the Due Process Clause of the Fourteenth Amendment.  *Vachon v. New Hampshire*, 414 U.S. 478, 94 S.Ct. 664, 38 L.Ed.2d 666 (1974); *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960).  In this regard it is noted that the sanity of the accused is always an element of the offense charged.  *Brooks v. Rose, supra.*  Usually though, the presumption of sanity, standing in the place of evidence when no question is raised about the issue, takes care of the prosecution's burden of proving sanity.  Under the Tennessee rule, however, once the defendant's evidence or the state's evidence raises a *prima facie* issue as to the defendant's sanity, the burden shifts to the state to establish the defendant's sanity beyond a reasonable doubt. *Pyburn v. State*, 539 S.W.2d 835 (Tenn. Crim.App.1976); *Collins v. State*, 506 S.W. 2d 179 (Tenn.Cr.App.1973).

One of the most generally accepted rules in all jurisprudence, state and federal, civil and criminal, is that the questions of the credibility and weight of expert opinion testimony are for the trier of facts, and that such testimony is ordinarily not conclusive even where it is uncontradicted. *The Conqueror*, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897); *Mims v. United States*, 375 F.2d 135 (5th Cir. 1967); *Hallabrin v. C. I. R.*, 325 F.2d 298 (6th Cir. 1963); *Casteel v. Southern Ry. Co.*, 187 Tenn. 586, 216 S.W.2d 321 (1948); 31 Am.Jur.2d "Expert and Opinion Evidence" § 183.  As far as expert opinion on insanity is concerned, it is just as subject to error as expert testimony on other matters, if not more so.  Although psychiatry has progressed rapidly, it is still a comparatively young profession dealing not with an exact science, but rather with a controver-

sial and rapidly developing one. *See Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 at 1310; *Mims v. United States, supra.*

■ The rule is generally stated to be that when the issue of insanity is raised as a defense in a criminal trial, it should be determined by the jury from all the evidence, rather than from the opinions of experts alone. *Davis v. United States,* 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895); on second appeal, 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750 (1897); *Mims v. United States, supra; United States v. Currens,* 290 F.2d 751 (3d Cir. 1961). It is the jury which is charged with the duty of determining, from the evidence admitted in an adversary proceeding, the question of criminal responsibility of the accused and thus the jury is not bound by the mere expression of conclusion by the expert. *Carter v. United States,* 102 U.S.App.D.C. 227, 252 F.2d 608 (D.C. Cir. 1957); *Sparkman v. State,* 469 S.W.2d 692 (Tenn.Crim.App.), *cert. denied, id.* (1970). In this regard it should be noted that there are many reasons why a jury may refuse to accept as conclusive an expert's opinion. It may be made to appear that the expert's opinion is based on incorrect or inadequate facts, or that the expert is equivocal in his responses, or that the expert has only seen and treated the defendant on one occasion. *Mims v. United States, supra; Carter v. United States, supra.* Also, the probative value of the expert's opinion may be lessened where it is predicated on subjective symptoms, or where it is based on narrative statements by the interested defendant concerning past events. *Mims v. United States, supra.* Likewise, cross-examination may play a role in lessening a jury's belief in the testimony of an expert witness. Finally, due consideration must be given to the fact that the trier of facts has the opportunity to view the witness's demeanor if he testifies in person. *Mims v. United States, supra; Martin v. United States,* 109 U.S.App.D.C. 83, 284 F.2d 217 (D.C. Cir. 1960).

■ With respect to whether or not there was sufficient evidence introduced at trial regarding the petitioner's sanity to satisfy the requirements of due process, the evidence adduced at trial indicated that several lay witnesses had an opportunity to observe the defendant immediately prior and immediately subsequent to the crimes. Of critical importance to the issue of petitioner's sanity is the testimony that traces his conduct from his learning that his wife had gone to the lake with Fariss. Less than an hour prior to the shooting, and upon learning of his wife's whereabouts, the petitioner purchased a revolver and a box of ammunition and proceeded to the lake in search of his wife. He persuaded two friends to take him out on the lake in their boat, whereupon he emptied his pistol at his wife and Fariss. He then returned to the shore, reloaded his pistol, proceeded back to the pier and fired five more shots at the two victims. After the second shooting, petitioner sat down on a bench and told bystanders that he was not going to cause trouble, that he had come to kill both of the victims and that he had accomplished his purpose. He advised these witnesses that, "Nobody's going to steal my wife and my boat, too." When interviewed later that same day by the police, he gave a detailed account of his actions. All of the witnesses who either saw or talked to the defendant prior to, during, and following the shootings testified that the defendant was rational and appeared to be normal.

■ The Supreme Court of Tennessee has held that the words and acts of a defendant immediately before, during, and after the offense are the best evidence of his state of mind at the time of the acts charged. *Brooks v. Rose, supra; Mullendore v. State,* 183 Tenn. 53, 191 S.W.2d 149 (1945). Moreover, under Tennessee law where testimony as to the facts permits even an inference that the defendant was sane at the time of the offense charged, the jury is entitled to reject expert and lay opinion testimony to the contrary. *Brooks v. Rose, supra; Sparkman v. State, supra.* Having considered the record in this case, the Court is of the opinion that the lay testimony offered at trial was sufficient

evidence upon which the jury could have based its finding that the petitioner was sane at the time he committed the acts charged. *Brooks v. Rose, supra.* Further, the Court is of the opinion that due process did not require the jury to accept the conclusions of Drs. Cheatham and Sottong which were formulated after only one interview each with the petitioner, and which were arrived at based upon the petitioner's recountal of events and without the benefit of other witnesses' testimony concerning the petitioner's actions and statements at the time of the crime. *See Mims v. United States, supra.* Accordingly, the petition for habeas corpus relief will be denied.

An order will so enter.