Cecil Lewis BROWN, Plaintiff in Error,

v.

STATE of Tennessee, Defendant in Error.

Court of Criminal Appeals of Tennessee.

Oct. 19, 1971.

Certiorari Denied by Supreme Court
Feb. 7, 1972.

B. Rex McGee and Thearon F. Chandler, Knoxville, for plaintiff in error.

David M. Pack, Atty. Gen., Weldon B. White, Asst. Atty. Gen., Nashville, Ronald A. Webster, Dist. Atty. Gen., William Zane Daniel, Asst. Dist. Atty. Gen., Knoxville, for defendant in error.

## OPINION

MITCHELL, Judge.

Cecil Lewis Brown, who will be referred to as the defendant or by name, on the 14th day of December, 1969 with a pistol shot and killed Horace V. Keys. He was convicted in the Criminal Court of Knox County of murder in the first degree and the jury fixed his punishment at ninety-nine years in the penitentiary.

After the motion for a new trial was overruled, the Trial Judge Honorable Joe D. Duncan, pronounced judgment upon the defendant for ninety-nine years in the penitentiary. The defendant appealed and assigned errors that:

1. The evidence preponderates against the verdict of the jury.

2. The trial court erred in not granting a mistrial because of remarks made by the District Attorney General during argument.

3. The trial court erred in admitting into evidence the contents of a brown paper bag found on the defendant's property.

4. The trial court erred in refusing to allow a lay witness to testify that the defendant had passed out and by allowing said witness to testify that the defendant was asleep.

According to the testimony of Mrs. Elizabeth Harbin Parton she was present on December 14, 1969 when the defendant shot and killed Horace Keys. At that time she was Mrs. Elizabeth Harbin but has since married Lowell Parton.

Mrs. Parton testified that she had been working at the Standard Knitting Mill for ten years. She formerly lived on Monmouth Street. That she and the defendant Brown owned the house together and she sold him her part of the house. They had bought the house on Monmouth Street together before either of them were divorced. The defendant Brown would come by of a morning and have breakfast and occasionally she would pack his lunch, but he had spent the night there on occasions in the back bedroom. They were not married to each other.

That she worked on week-ends at the Jiffy Restaurant at Fountain City commencing about October or November, 1969. That she met Horace Keys at the Jiffy Restaurant about three weeks before the shooting. She had heard his wife had died, and she (Mrs. Harbin-Parton) was not married at that time. That Mr. Keys had known her mother several years. On Tuesday immediately before December 14, they met and had coffee together. Wednesday he called her on the phone. On Friday he called again and asked her to go out with him Saturday night. She had not been out with him before that except for coffee. Mr. Horace Keys came alone in his car to her house between 7:00 and 8:00 P. M. They had planned to go out with her sister and her boyfriend. Mrs. Harbin's car was in the garage at her house. Mrs. Harbin's sister and her date Carlos Martin, together with Mr. Keys and Mrs. Harbin left in Mr. Martin's car, leaving Mr. Keys' car in the driveway. They went uptown to the Tennessee Theater. The movie was over about 11:00 o'clock. Then the four of them went to the Krystal on Broadway where they had coffee, and were there about fifteen minutes, and then went back home about 11:15 P. M.

Her daughter, age 15 and her brother Bobby Preen, age 21 were staying with her at that time. Her brother had lately arrived from Germany and was scheduled to leave for Viet Nam. Mrs. Harbin and Mr. Keys got out of Mr. Martin's car and got

into Mr. Keys' car and went for a drive. They went to Harbison's crossroads, then to the Krystal, then to Whittle Springs and then back home about 12:35 A. M. They drove in the driveway and Mrs. Harbin opened the car door to get out when her brother-in-law's car pulled up across the street almost behind the driveway. Her brother-in-law's car was light blue. She thought it was her brother-in-law looking for her sister. It pulled out and went on up to the church on Fairview and set there for perhaps two minutes to five minutes and then it came back. Mr. Keys and Mrs. Harbin were still sitting in the car. Mr. Keys in the driver's seat and she was on the other side of the seat. The lights of her brother-in-law's car were still on and it came back down in front of Mr. Jones' house, beside the garage. It was not blocking the driveway.

Mr. Brown, the defendant got out of the car, and started up on her side but she did not know who it was at the time. He then went around on Mr. Keys side of the car and hit the glass. Mr. Keys was sitting with his right leg up on the seat facing Mrs. Harbin with his back to the window or door glass. The glass in the door was closed, that is the window was up. Mr. Brown hit the glass with the pistol twice and said, "how long have you been staying here?" Mr. Keys turned around and Mr. Brown opened the car door and he got Mr. Keys by the shoulders of the coat. He had his head pulled over between the car and the car door. "It happened in a matter of seconds. He just grabbed him and he just pulled him over there and put the gun to his head and shot." That before he shot Mr. Keys, the defendant said, "Aw, hell." "He said aw hell, and pulled the trigger."

Mr. Keys had no gun or weapon of any kind. Mr. Keys did not say anything to the defendant Brown. At the time Mr. Keys was shot he was still sitting in the seat but had his head out between the door and the car. Mrs. Harbin got out of the car and started to run around to the other side and said to the defendant, "Lord have mercy, what have you done?" The defendant raised the gun and Mrs. Harbin thought he was going to shoot her too and she ducked in front of the car. When she raised up the defendant had the gun down by his side. Mr. Keys was still sitting in the car with his head over. The defendant Brown said, "I don't know what you've made me do", and the defendant then reached and took hold of Mr. Keys. Mrs. Harbin ran to the house and latched the screen door. She looked back and saw the defendant had not closed the door on her brother-in-law's car and its lights were still on in the car in which the defendant had driven up.

Mrs. Harbin identified a picture of herself which belonged to the defendant in a paper bag which was found on the defendant's lawn. According to Mrs. Harbin the defendant had kept the picture in a frame under glass on his mantle over the fireplace. She told the officer about the shooting of Mr. Keys by the defendant.

Detective Robert Chadwell testified he went to 2100 Edgewood where he investigated the killing of Horace Keys, December 14, 1969. That deceased had a gunshot wound in the head almost between the eyes. That Mrs. Elizabeth Harbin gave him the name of the defendant Cecil Brown and his address, 3317 Monmouth and told how the killing happened. That they went to the place for the purpose of arresting the defendant but did not find him at home and as they were leaving, walking through the defendant's yard they found a brown paper bag containing broken glass apparently from a picture frame and a torn photograph of Mrs. Elizabeth Harbin. There was some writing on the back of the picture. That the brown paper bag and its contents had been in his possession since that date.

They took photographs at the scene. They found a Plymouth automobile in the driveway at Mrs. Harbin's house, 2100 Edgewood headed into the garage with the driver's door open and the body of Horace Keys laying face down on the driveway be-

side the car. Mr. Keys did not have a weapon.

Detective Chadwell went to the University Hospital to examine the body of Horace Keys, then went to Kodak, Tennessee to locate Ronald Stinnett who is Mrs. Harbin's brother-in-law, where he saw and talked to Mr. Stinnett. That he received a telephone call from Mr. Tonkin. That he went and talked to Mr. and Mrs. Tonkin. Mr. Tonkin gave him a .38 caliber bright Smith & Wesson revolver with a four inch barrel, serial no. 282377. (He identified State's exhibit 12). The pistol and the bullet (State's exhibit 13) from Mr. Keys' head were sent to the F. B. I. Laboratory in Washington.

It was stipulated by the State and the defendant that if Dr. William Elliot were called and introduced as a witness he would say that he is a pathologist duly qualified, that he performed an autopsy on the body of Horace Keys, Sr. That he died as a result of a gunshot wound inflicted December 14, 1969. That he removed from the head of Horace Keys the bullet marked W. E. and introduced as State's Exhibit 13 which was turned over to Detective Robert Chadwell.

Ralph Rigdon Tonkin testified that he and his wife Ruby lived at 3315 Monmouth Street and is a next door neighbor of the defendant, Cecil Brown. That about 1:15 A. M. Sunday morning, December 14, 1969 the defendant came to his house and said, "I've got some bad news, I'm afraid I might have killed a man, I don't know for sure." He said, "If I did, it was a mistake, I didn't mean to." "It was an accident." He had a revolver and said, "I'd like for you to take this." "You can do what you want to with it, you can keep it, you can give it away, you can sell it, or whatever you want to, I don't want it." That the defendant was not there over five minutes. Mr. Tonkin identified the pistol as State's exhibit 12. That he did not detect the odor of alcohol on the defendant, nothing unusual about his walk, that in his opinion the defendant was not drunk. Mr. Tonkin gave the pistol to Detective Chadwell. Mrs. Ralph Tonkin's testimony corroborated her husband about the defendant coming to their house to see her husband.

Warren G. Johnson, F. B. I. Agent, testified he is a Fire Arms Examiner for the F. B. I. That he received from the Knoxville Police Department a revolver and a mutilated bullet. That he made the standard tests and examinations of the revolver and the bullet and gave it as his opinion that the bullet sent him by the Knoxville Police Department in the case at bar was fired from the revolver filed as Exhibit 12.

George K. Jones testified that on December 14, 1969 he lived at 2822 Fairview directly behind the home of Mrs. Elizabeth Harbin (Parton). That about 12:50 the night of the shooting of Horace Keys he heard a shot and then heard a car door slam and drive off. He discovered something was wrong over at Mrs. Harbin's. He saw Mrs. Harbin run around the car and open the door and reach down inside and went back toward the house. He went over there and Mrs. Harbin was standing at the car door again. He talked to Mrs. Harbin. Mr. Keys was laying on the ground. Mrs. Harbin asked if he was dead, Mr. Jones told her he thought he was, his brains were protruding through the hole. Mrs. Harbin kept saying, "he's killed him."

Roland Stinnett age 29 testified that he is a friend of the defendant and a brother-in-law of Mrs. Elizabeth Harbin Parton. Mrs. Stinnett is a half sister of Mrs. Parton.

On December 14, 1969 he went to the defendant Brown's house between 7:30 and 8:30 P. M. That they drank about a pint and a half of liquor between them. The defendant was upset over a falling-out he and Mrs. Harbin had. He was talking about everything he had done for her and the way she was treating him. He "busted" her picture which was in a glass frame and swept it up in a paper bag. He tore

the picture in strips. He said he ought to take the picture and the brown bag down there and set it on her doorstep.

That he and the defendant drove by Mrs. Harbin's house and he got Mr. Keys car license number which was a Union County license plate. He called somebody and got the name of the owner of the car. It was about an hour after he got the license number that he broke the picture frame and tore up Mrs. Harbin's picture. Mr. Stinnett had left his keys in his car. The defendant drove Mr. Stinnett's car away and was gone about fifteen minutes and came back. "Well, he—I had just walked out in the yard as he come in, and he came in, in a rush, jumped out of the car, and he told me to get out of there, and I quizzed him, I said, "What's wrong?" He said, "Don't ask me any questions, just get out." He run to the house next door and was trying to get in, and he hollered back at me and told me to go in the house and turn the lights off. Of course, I didn't, I just went on and I set that brown paper bag out in the yard."

The paper bag was in the front of the seat of the car.

The defendant testified in his own behalf that he had been married and divorced. That he had known Mrs. Parton, who was then Mrs. Harbin for about ten years. That they bought a house together at 3317 Monmouth and he later bought her part. That they both lived in the same house some. That they were quite close. That they went on vacations together. That he loved Mrs. Harbin.

That Roland Stinnett wanted him to go with him to look for his wife, they were separated at the time and Mrs. Stinnett and Mrs. Harbin were half-sisters. They went by Mrs. Harbin's house and saw a car setting in the drive-way. Mr. Stinnett gave the defendant the license number of the car. He called his son who verified that the owner of the car was Horace Keys. That he did not know at that time that Mr. Keys was dating Mrs. Harbin.

The defendant identified the pistol filed in the case as his pistol, that it was laying on the desk. That he started to clean it, that he unloaded it and showed it to Mr. Stinnett. That he just stuck the pistol in his pocket and thought it was unloaded. That he had drunk quite a bit and was "pretty high." That he was going over there to Mrs. Harbin's to leave the paper bag containing the broken picture. That he did not know Mr. Keys was there, that he passed Mrs. Harbin's house and turned around and came back. He could not tell anybody was in the car, that the glass in the car was fogged up. That he had the pistol in his pocket, he took it and pecked on the glass and requested them to roll the glass down, "but there was no answer instead the door just shoved open. The door shoved open striking me and I stumbled backwards." "As I recall I started stumbling backwards and the person in the car was coming out of the car, but I was off balance, and I was" . . . "As I was stumbling backwards, the gun did discharge. I found later it must have been my gun, I couldn't realize it was, because I was so sure it was empty." "I had no idea there was any bullets in the gun."

He testified he had no animosity toward Mr. Keys, and was not afraid of him, that Mr. Keys had never done any harmful thing to him.

That the next thing he saw Mr. Keys was falling to the ground. That he never touched Mr. Keys at anytime. That Mr. Keys was never in the car after the gun fired, to his knowledge.

The defendant said he was shocked, that he knew the gun had no ammunition in it.

That he hadn't recognized that it was Mrs. Harbin until she came around the front of the car and she said, "C., you have killed him", and I said, "call an ambulance, and then I just"—"I don't know, it seemed like I went all to pieces, and I left." That he had his brown paper bag still with him in the car. That he got out and Roland Stinnett was coming out of his

house. The defendant said he was then at Mr. Tonkin's house, she was letting him in and he talked to Mr. Tonkin and gave him the pistol.

In his first assignment of error here the defendant makes the contention that the evidence preponderates against the verdict of the jury and in favor of his innocence. The law is that a guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. Such a verdict removes the presumption of innocence of the accused which stands as a witness for him until he is convicted, and raises a presumption of his guilt upon appeal, and he has the burden upon appeal of showing that the evidence preponderates against the verdict and in favor of his innocence. McBee v. State, 213 Tenn. 15, 372 S.W.2d 173; Gulley v. State, 219 Tenn. 114, 407 S.W.2d 186; Brown v. State, Tenn.Cr. App., 441 S.W.2d 485; Gann v. State, 214 Tenn. 711, 383 S.W.2d 32.

The credibility of the witnesses and conflicts in the testimony are all settled by the verdict of the jury. Gann v. State, *supra*; Hargrove v. State, 199 Tenn. 25, 28, 281 S. W.2d 692, 694; Morrison v. State, 217 Tenn. 374, 397 S.W.2d 826, 400 S.W.2d 237.

The defendant has failed to carry the burden of showing that the evidence preponderates against the verdict of the jury and in favor of his innocence.

Upon the record in this case the jury was justified in finding, as they must have done by their verdict, that the defendant became angered and enraged at the man who was apparently enjoying the favor, interest and affection of the woman he loved and which, by reason of their former association and close relationship he felt he was entitled to.

The defendant's insistence that there was no evidence of premeditation is refuted by the fact that the defendant was spying on Mrs. Harbin's activities and showing more than normal interest in whom she was "dating" and "going out" with. It is reasonable to conclude that the jury did not overlook the significance of the defendant armed with a loaded pistol driving by Mrs. Harbin's house and stopping and coming back and walking up to the car in which Mrs. Harbin and the victim, Mr. Horace Keys were sitting, and according to his testimony demanding that they roll down the glass in the car door and tell him how long he had been living there. This happened after the defendant had talked to Mrs. Harbin's brother-in-law about the disappointment he experienced at the way Mrs. Harbin was treating him after he had done so much for her. In this frame of mind the defendant went to the home of Mrs. Harbin, walked up to the car in which Horace Keys was seated with Mrs. Harbin in the midnight hours, and without justification or excuse brutally shot and killed and murdered an unarmed man, whom he swore had never harmed him.

The defendant contends that the evidence preponderates against the jury's finding of premeditation and murder in the first degree. With this we are forced to disagree.

Prior to the killing of Horace Keys and earlier in the same evening, the defendant had driven by the house of Mrs. Harbin, got the license number of the car parked in Mrs. Harbin's driveway, returned home and after a phone call he learned the car belonged to Horace Keys.

It is true there is some evidence that the defendant was brooding over what he thought was for him an unfortunate turn in his love affair with Mrs. Harbin and that he deliberately broke the picture frame containing her picture and tore the picture in strips. The evidence also shows he drove to the house of Mrs. Harbin where she and Horace Keys were sitting in the car in the driveway near the hour of midnight and that he walked up to the car, opened the door and reached in and seized this defenseless man by the shoulder, pulled

him over, pointed the pistol at his head and literally blew his brains out.

We agree with the contention of the Attorney General that the actions of the defendant in taking the license number of the car in Mrs. Harbin's driveway, and after phoning and learning that Keys was the owner, then taking his pistol with him and waiting outside Mrs. Harbin's residence before the killing, and the manner in which he approached the car in which Keys and Mrs. Harbin were sitting and the seizing and shooting of the unsuspecting victim without allowing him a chance to explain his presence or to defend himself, established premeditated murder. In Clarke v. State, 218 Tenn. 259, 402 S.W.2d 863, the Court said:

"The distinctive characteristic of murder in the first degree is premeditation. This element is super-added, by the statute, to the common law definition of murder. Premeditation involves a previously formed design, or actual intention to kill. But such design, or intention, may be conceived, and deliberately formed, in an instant. It is not necessary that it should have been conceived, or have preexisted in the mind, any definite period of time anterior to its execution. It is sufficient that it preceded the assault, however short the interval. The length of time is not of the essence of this constituent of the offense. The purpose to kill is no less premeditated, in the legal sense of the term, if it were deliberately formed but a moment preceding the act by which the death is produced, than if it had been formed an hour before. The mental state of the assailant at the moment, rather than the length of time the act may have been premeditated, is the material point to be considered. The mental process, in the formation of the purpose to kill, may have been instantaneous, and the question of vital importance is—was the mind, at that moment, so far free from the influence of excitement, or passion, as to be capable of reflecting and acting

with a sufficient degree of coolness and deliberation of purpose; and was the death of the person assaulted, the object sought to be accomplished—the end determined upon."

"That this holding from the Lewis case is the general rule as shown by Wharton's Criminal Law and Procedure. Anderson, Vol. 1, Sec. 267, pp. 563–568 (1957) where we find the following:

"Deliberation and premeditation involve a prior intention or design to do the act in question. It is not necessary, however, that this intention should have been conceived at any particular period of time, and it is sufficient that only a moment elapsed between the plan and its execution, as long as the jury can conclude that there was some appreciable interval however small. It is sufficient that with the intention to commit the act the appreciation of the result likely to follow appeared to the defendant at the time the act was committed, or that he understood and contemplated the consequences of his act."

"Whether premeditation is present in a given case is a question of fact to be determined by the jury from all the circumstances of the case, such as the use of a deadly weapon upon an unarmed victim."

The elements of premeditation and deliberation may be inferred from the circumstances of the killing. Edwards v. State, 221 Tenn. 60, 424 S.W.2d 783. If the design to slay was premeditated, it is not material that the defendant was in a passion or excited when that design was executed. Presley v. State, 161 Tenn. 310, 30 S.W.2d 231.

By his second assignment of error the defendant complains of prejudicial statements which the District Attorney made in his argument to the jury. The defendant's counsel made timely objections to this argument. The trial judge promptly sustained the defendant's objections and fully

and explicitly cautioned the jury not to consider it.

We are of the opinion that the caution and admonition given by the trial judge on this question adequately took care of the matter and that the verdict was not affected by the objectionable argument, and that no prejudice resulted to the defendant, that it was harmless and that he was not deprived of a fair and impartial trial. King v. State, Tenn.Cr.App., 430 S.W.2d 810.

In Morrison v. State, 217 Tenn. 374, 397 S.W.2d 826, the Court said:

"This Court has examined the argument of the District Attorney General, and the evidence presented at the trial, and can come to no other conclusion than that irrespective of what the District Attorney General's purpose was in his emotionally charged statement that such statement had no effect on the outcome of the trial. Therefore, even if the argument was improper, it would not justify reversal, since the situation falls within the scope of the harmless error statute, T.C.A. 27–117. See also Crowe v. Provost, 52 Tenn.App. 397, 374 S.W.2d 645."

█ In his third assignment of error the defendant complains that there was illegal search and seizure of the paper bag containing the broken glass from a picture frame and the torn picture of Mrs. Harbin.

According to the testimony of the officer on this point Mrs. Harbin, an eye witness to the killing only a few minutes after it happened, told the officer, who came to the scene and saw the dead man with a bullet wound in his head, lying in the driveway, that the defendant Cecil Lewis Brown killed the man. The officer without a warrant, as he had a right to do, on information that the defendant had committed murder, went to the home of the defendant for the purpose of placing him under arrest. But being unable to find the defendant at that time, the officer left the home and as he was walking out across the front lawn of defendant's home, he found the brown paper bag laying beside a tree. That he took possession of the paper bag and contents and preserved them to be used as evidence. No search was necessary. The paper bag was there in plain view. The officer, after receiving the information from Mrs. Harbin, was lawfully on the premises of the defendant and had a right to examine and seize anything he saw which might be used as evidence. Lloyd v. State, 223 Tenn. 1, 440 S.W.2d 797; Gerchman v. State, 206 Tenn. 109, 332 S.W.2d 182.

█ Moreover the defendant voluntarily testified in detail about breaking the picture frame in question, and about tearing into strips the picture which had been in the frame and that he placed the broken glass and the torn picture in the brown paper bag and took it over in the car intending, as he said, to place it on Mrs. Harbin's doorstep.

Of course after voluntarily testifying in detail about this evidence and admitting he had it, he cannot effectively assign error on account of its seizure. We held in Tooley v. State, Tenn.Cr.App., 448 S.W.2d 683 in an opinion by Presiding Judge Mark Walker, filed September 8, 1969 that:

"A defendant may make illegally seized evidence admissible by his testimony on direct examination. Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503. See Lester v. State, 216 Tenn. 615, 393 S.W.2d 288; Burks v. State, 194 Tenn. 675, 254 S.W.2d 970; Batchelor v. State, 213 Tenn. 649, 378 S.W.2d 751; 29 Am.Jur.2d Evidence, Sec. 416. He has done this and is now precluded from questioning the search."

█ The fourth assignment of error is that the Trial Judge erred in refusing to permit a lay witness to testify that the defendant was drunk and passed-out after the commission of the alleged crime and in stating in the presence of the jury that he would permit the lay witness to testify that the defendant was asleep. The defendant

also complains that the manner in which the Trial Judge ruled on the question amounted to a substantial comment on the evidence.

We are unable to find any merit in this assignment.

This fourth assignment arose out of the testimony of James Chandler who was introduced by the defendant and who testified that the defendant came to his house about 1:30 or 2:00 o'clock A.M. on December 14, 1969. This evidently was after the defendant said he had seen and talked to Mr. Stinnett and Mr. Tonkin.

That "he was pretty well drunk." "He couldn't talk too good." That he suggested to the defendant that they get in the car which they did and that he drove off with the defendant. That he did not haul him long until the defendant went to sleep, passed out. Here the District Attorney objected on the ground that that was a conclusion. The Trial Judge sustained the objection, as to the words "passed-out" and instructed the jury not to consider that.

The witness then testified the defendant ceased talking. Defense counsel told the witness he could not use the words "passed out" or "asleep". The Trial Judge then reminded counsel that he did not say he could not use the word "asleep." Defense counsel then remarked to the court that there was quite a bit of difference between passed out and asleep, to which the Trial Judge agreed and said, "I will let you ask him if he was asleep." "I am not going to let him answer whether he was passed out or not. That connotes too many different things, too many different interpretations."

Then the witness testified the defendant was asleep for a couple of hours.

The record fails to show that the defendant's counsel noted or preserved any specific objection or exception to the adverse ruling of the Court.

We think there is not any great difference in the meaning of the two terms "asleep" and "passed out". Webster's New College Dictionary and Funk & Wagnall's Encyclopedic College Dictionary define sleep and asleep as dormant; a period of reduced physical and nervous activity, accompanied by a suspension of voluntary movements and a complete or partial unconsciousness. The same authorities define "passed-out" as a faint or unconsciousness.

We hold that the Trial Judge was not in error in sustaining the District Attorney's objection and that there was nothing said by the Trial Judge that could be construed as commenting on the evidence.

The defendant in his testimony had given an account of how he approached the parked car in the driveway in which the victim Horace Keys and Mrs. Harbin were sitting. That he walked up on the drivers side, with his pistol in his pocket, that he took the pistol and pecked on the glass with it and requested they roll down the glass. That he was standing real close to where the door opened and instead of any answer at all to his request, the door was shoved open striking him and he stumbled backwards. That he was off balance, the person in the car was coming out of it, and as he was stumbling backwards the gun discharged. That he found later it must have been his gun that he couldn't realize it was, because he was so sure it was empty. That he had no animosity toward Mr. Keys. That he had no reason to be afraid of him, that Keys had never harmed him. That defendant said that Mr. Keys fell to the ground. That he gave a minute description of what Mrs. Harbin did and what she said and what he said to her. That he was shocked. That he was drunk. That he went to his house and Roland Stinnett was coming out the front door. That he went next door to Mr. Tonkin's house and went in and talked to Mr. Tonkin and presented the pistol to him. That he told Mr. Tonkin he might have killed a man, if he did it was accidental, that it was something he couldn't help, and he wanted him to take the pistol and do what-

ever he wanted to do with it. That he had not opened the chamber of the pistol or disturbed the shells or hulls. That the pistol had fired only one time.

The Trial Judge had fully and correctly instructed the jury on the effect of intoxication on the ability of an accused to form a premeditated design to kill.

After hearing the defendant's detailed, but unreasonable and unimpressive account of the manner in which he said the killing happened, the jury rejected his theory and found him guilty of murder in the first degree.

On this subject where a defendant was convicted of murder in the first degree and sentenced to 99 years in the penitentiary our Supreme Court said in Jackson v. State, 180 Tenn. 158, 172 S.W.2d 821, that:

"The defendant insists that he was intoxicated to such an extent that he did not know right from wrong. But the proof shows that the defendant procured a shotgun at the home of his father, that he went to Alamo and left the shotgun at a garage, that a very short time later he went back to the garage and procured his shotgun, that he directed the Byrd boy to drive him to the home where his wife was stopping, that upon her refusal to come out and talk with him he had Byrd drive him down the road, that he then got out of the car and left Byrd some ten minutes after stopping and went back to the front porch of the home where his wife was. Coupled with this state of facts, the ability of the defendant to look through a window from the darkness and single out his wife, into whose body he placed the fatal shot, shows clearly that he had the ability to choose."

There was a great deal of proof of the fact that the defendant had consumed a considerable quantity of intoxicants but we conclude that the jury correctly found that he was not at the time of the killing intoxicated to the extent that he was unable to form a premeditated design to kill the man who had taken his place in the affections of Mrs. Harbin.

We find that the defendant had a fair and impartial trial, that he was represented by eminent counsel and that the trial judge in the conduct of the trial scrupulously guarded the rights of the defendant, and that the jury properly found the defendant guilty of murder in the first degree.

The assignments of error are overruled and the judgment is affirmed.

OLIVER, J., concurs.

GALBREATH, J., did not participate in this opinion.