# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 10, 2012

## STATE OF TENNESSEE v. RAYMOND BUFORD

### Direct Appeal from the Criminal Court for Shelby County
### No. 09-02882   W. Otis Higgs, Judge

### No. W2011-00368-CCA-R3-CD  - Filed September 24, 2012

A Shelby County Grand Jury returned an indictment against Defendant, Raymond Buford, charging him with premeditated first degree murder.  Following a jury trial, Defendant was convicted of the offense and received a life sentence.  On appeal, Defendant argues: (1) that the evidence was insufficient to support his conviction; and (2) that the trial court erred in allowing testimony of prior bad acts committed by Defendant against the victim. After a thorough review, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Robert Wilson Jones, District Public Defender; and Tony N. Brayton, Assistant Public Defender, Memphis, Tennessee, (on appeal); and Cary Woods, Yollander Hardaway, Brooke Hyman, and William Kelly, Memphis, Tennessee, (at trial) for the appellant, Raymond Buford.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; Stephen Crossnoe and Carla Taylor, Assistant District Attorneys General; for the appellee, the State of Tennessee.

# OPINION

## I. Background

*Pre-Trial Tennessee Rule of Evidence 404(b) Hearing*

The victim's and Defendant's seventeen-year-old son testified that on January 4, 2009, they were living at 1649 Pinecrest Drive in Memphis. The victim's son testified that he woke up early that morning and heard arguing. He walked into the victim and Defendant's bedroom and saw Defendant on top of the victim "strangling" her, and she said, "[Defendant] get off of me." The victim's son testified that he said, "Y'all need to stop," and the victim said, "That's not me, that's him." He said that Defendant stopped choking the victim, and she walked downstairs to get something to eat. The victim's son testified that Defendant followed her downstairs and shoved her because Defendant thought that she was going to stab him. However, he said that the victim was not going to stab Defendant, and that she was just getting something to eat. The victim's son testified that Defendant pushed the victim into "the door, it was like it had little vents up in it and when he pushed her, all that had broken." Defendant then left the house, and the victim called police and began crying. The victim's son testified that police arrived and took statements, and the victim asked him to go outside and tell Defendant, who was in custody in a patrol car, that she still loved him. The victim's son testified that he noticed bruises on the victim's neck.

The victim's fifteen-year-old son testified that on January 4, 2009, he was downstairs sleeping on the couch when he woke up and heard the victim and Defendant arguing. He said that the victim walked downstairs, went into the kitchen, "got two pieces of bread out and then got a knife and put some mayonnaise on it." The victim's son testified that Defendant walked downstairs fifteen seconds later and went into the kitchen, and "then they was just tussling with each other by the hand." He said that the victim then "got leaned over towards the washing machine and then got pushed back and then I didn't see them." The victim's son further testified: "They was moving and he started choking her and then twisting her arm and then pushed her into the heating machine, or whatever it was, in the kitchen." He said that Defendant then stopped and left the house. The victim called police and a relative, and she began crying. The victim's son testified that his mother's arm was swollen, and she had bruises on it. He said that Defendant was later taken into custody.

*Trial*

Sherri Holpe testified that she last saw the victim, Valerie Wilson, alive on February 15, 2009, between 7:00 and 8:00 a.m. She explained that the victim, who was her younger sister, had a birthday/Valentine party for her which began on February 14, 2009, and lasted

into the early morning hours of February 15, 2009. Ms. Holpe testified that the victim served as the bartender at the party, which was held at Ms. Holpe's house located at 2985 Semmes Street in Memphis, and Defendant, the victim's husband, was also there. She said that the victim and Defendant, who lived near her at 2971 Semmes Street, left the party between 3:00 and 4:00 a.m., and the victim later returned. Ms. Holpe testified that the victim left the party again at some point to wake Defendant up to go to work, and the victim returned with an air mattress and continued mingling with some guests who were still there. Ms. Holpe testified that Defendant returned to her house at some point and told the victim to "[c]ome here." When the victim told Defendant that she did not want to talk to him, he grabbed her and pulled her outside. The two talked, and Defendant left. Ms. Holpe testified that Defendant returned and pulled the victim out of the house again and into the driveway. Ms. Holpe and several others went outside and asked Defendant to leave the victim alone. Ms. Holpe testified that Defendant continued to pull the victim across the street to their house. She said that the victim was yelling, "Somebody get me a phone, somebody give me a phone." Ms. Holpe attempted to dial 9-1-1 on her cell phone, but the phone was not working. She then went inside to get another phone but by the time she got back outside, the victim was dead.

Ms. Holpe testified that the victim met Defendant approximately eighteen years prior to the victim's death. She indicated that the victim and Defendant frequently separated during their eighteen-year relationship, and the victim was the one who always left the house. Ms. Holpe thought that Defendant was the biological father of three of the victim's six children, but Defendant helped take care of all the children She said that there was someone at the party who the victim had been accused of dating; however, Ms. Holpe testified that the victim was not dating that person. Ms. Holpe testified that her children and Sharese McCray's children were at the victim and Defendant's house during the party.

Rosalyn Albright testified that the victim was her boyfriend's first cousin, and she had known the victim and Defendant for sixteen years. Ms. Albright arrived at the party at Ms. Holpe's house between 9:30 and 10:00 p.m. on February 14, 2009. Defendant and the victim were already there, and everyone seemed to be having a good time. Ms. Albright testified that Defendant later "started to cause a little confusion" about something, and Ms. Holpe asked him to leave. She said that Defendant left and then came back and said something to the victim. She said, "And he left again and he come back to talk to [the victim] and he told her he wanted her to go home and talk and she told him, 'Well, we can talk right here.'" Ms. Albright testified that Defendant then "kind of snatched her out the back door." She said that the two were standing in the yard near the driveway talking, and he told Ms. Albright and "Tammy" to stay out of his business when they attempted to ascertain what was going on. Ms. Albright testified that Defendant then pulled the victim across the street and into their house by her jacket and slammed the door.

Ms. Albright testified that she, Tammy Richmond, and Sharese McCray went to the house, knocked on the door, and attempted to go inside but the door was locked. She said that one of the children eventually opened the door, and the three women went inside. Ms. Albright testified that she thought Defendant and the victim were arguing, and there was a lot of "commotion." She then saw a knife in Defendant's hand. Ms. Albright said that Defendant turned around, looked at her, and pulled her by the jacket. She said that Defendant's eyes were red, and he looked strange. Ms. Albright slipped and fell and then crawled out of the area until she could stand up and get out of the house. When Ms. Albright got out into the street, she looked back and saw Defendant outside with the knife still in his hand. She said that Defendant got into his truck, pulled out into the street, and sat there for a minute. He then left the scene. Ms. Albright testified that the victim did not have a boyfriend or an ex-boyfriend at the party. She did not recall anyone throwing anything at Defendant at the party.

Tammy Richmond, the victim's first cousin, testified that she also attended the party at Ms. Holpe's house. She estimated that there were thirty or more people at the party, most of whom were relatives. When Ms. Richmond arrived at the party, she saw the victim bartending, and Defendant was standing near the radio. She did not notice any incidents between the two. Ms. Richmond testified that Defendant left the party sometime after midnight with the victim, and they took some of the children home and put them to bed. She said that the victim returned to the party alone approximately twenty to twenty-five minutes later and continued bartending.

Ms. Richmond testified that Defendant returned to the party between 5:00 and 6:00 a.m. and said that he needed to speak with the victim. She said that the victim said "if you got to say something, you can say it here, right now, you can say it right here." Ms. Richmond testified that Defendant then pulled the victim by the arm and said that he wanted to talk to her at their house. She said that the victim did not want to go with Defendant, "but she did." Ms. Richmond testified that the victim later returned to Ms. Holpe's house with an air mattress for several people who were still there to sleep on, including Ms. Richmond. After the victim got the mattress blown up, Defendant showed up again and pulled the victim by the arm and said that he wanted to talk to her. The victim said, "I don't want to go." However, Defendant continued pulling her by the arm.

Ms. Richmond testified that she and Ms. Albright stepped outside, and Ms. Richmond asked Defendant what was going on. She said that Defendant responded, "None of your damn business." Ms. Richmond testified that she and Ms. Albright stood in the yard and watched Defendant pull the victim across the street to their house. At some point, she asked the victim if she would be all right, and the victim responded, "I'll be okay." Ms. Richmond testified that she thought Defendant and the victim were in the house fighting, so she, Ms.

Albright, and Sharese McCray walked across the street and knocked on the door, which was locked. After two or three minutes, the victim's son answered the door, and the three women walked inside. Ms. Richmond saw Defendant with a knife in his hand "coming out of the room where [the victim] was." She said that he went after Ms. Albright with the knife. Ms. Albright fell, and Ms. Richmond "drug her and she crawled the rest of the way out of the house." Ms. Richmond testified that she and Ms. Albright left the house but she did not see Sharese McCray leave. Ms. Richmond dialed 9-1-1 when she got outside. She said that Defendant got into his truck with the knife, backed out and sat there for a few minutes, and then he left. Ms. Richmond testified that Defendant's eyes were blood shot, and he had blood "over him, all over his hands." Ms. Richmond testified that she had never "seen him like that before."

Sharese McCray testified that she knew the victim, and she dated Defendant's brother. She arrived at the party at approximately 8:00 p.m on February 14, 2009. She said that the victim was bartending at the party, and Defendant was "standing by the DJ booth, drinking." He did not appear to be enjoying himself. Ms. McCray testified that she left the party at approximately 4:00 a.m. and returned near 5:00 a.m. She said that at some point, Defendant told the victim's brother, "Twelve, I ain't going to forget that you hit me with a beer can." Ms. McCray testified that Defendant left, and everyone continued to party. After Defendant left, Police were called to Ms. Holpe's house apparently due to the noise, and they asked Ms. Holpe to shut the party down. However, when they left, the party continued.

Ms. McCray testified that Defendant later returned to Ms. Holpe's house and knocked on the door. At that point, some of the partygoers were asleep in other rooms and on air mattresses. Ms. McCray testified that the victim answered the door, and Defendant told the victim to come outside so that he could talk to her. The victim refused, and Defendant grabbed her arm and forcefully pulled her down the steps causing her to fall. Ms. McCray testified that the two ended up in the front yard and then moved to the driveway. They eventually went across the street to their house. Ms. McCray testified that she and "Kwi-Kwi" went outside and tried to get Defendant to stop and leave the victim alone. She felt that Defendant was angry because he said, "I told you to come here," when he pulled the victim out of Ms. Holpe's house.

Ms. McCray testified that the victim appeared to be scared as Defendant pulled her to their front door, and she said, "[Defendant] I don't want to go in I am right here, talk to me here." Defendant then pulled the victim inside the house and slammed the door which automatically locked. Ms. McCray testified that she heard screaming and walked over to the house and began knocking on and kicking the door. She noted that her own children and other children were in the residence at the time. Ms. McCray testified that someone unlocked the door, and she and "Kwi-Kwi" went inside. She told "Kwi-Kwi" to get the

children, and Ms. McCray went to the back bedroom where she encountered the victim's son in the doorway. Ms. McCray testified that she saw the victim and Defendant both holding onto a knife, and the victim had blood on her face. The victim was begging Defendant not to kill her in front of her child. Ms. McCray said that Defendant took the knife out of the victim's hand, and the victim fell. He then came toward Ms. McCray and the victim's son with the knife and stabbed Ms. McCray in the arm, and she fell in the hallway. Ms. McCray testified that Defendant went back over to the victim, but Ms. McCray could not see what he was doing. Ms. McCray then called for help, and "Red" and "Tammy" came in. She said that as they were almost to her, Defendant walked by with the knife and told them to get off his property. Ms. McCray testified that "Red" and "Tammy" ran out the door, and Defendant walked back into the bedroom with the victim. Ms. McCray testified that two of the victim's other children eventually dragged her into the livingroom. She then told them to get out of the house. Ms. McCray testified that she was finally able to stand up, and she went back across the street to Ms. Holpe's house. Ms. McCray was eventually taken to the emergency room where she received nine stitches and later had surgery on her arm.

The victim's and Defendant's seventeen-year-old son testified he went to the party at approximately 8:00 p.m. on February 14, 2009, and he went back home between 10:00 to 10:30 p.m. His brothers and little sister were at the house, along with some of his cousins. He went to sleep at approximately 11:15 p.m. and was awakened by his little brother at 6:15 to 6:45 a.m. His little brother said that Defendant had dragged the victim from across the street and to the house. The victim's son testified that he got up, looked out the window, and saw Defendant pulling the victim around the house by her arm. He said that Defendant pulled the victim inside the house, "hurried up and locked the front door," and the two walked to the back bedroom. The victim's son then unlocked the door and let "Sherita, or somebody" into the house. He stood by a chair where he could see into the back bedroom. The victim's son testified that he saw Defendant shove the victim, and she ran into a door causing it to fall. He said that the victim stumbled and landed on her back. Defendant then ran into the kitchen, got a butcher knife, ran back into the bedroom, got on top of the victim, and began stabbing her. The victim's son testified that he kept telling Defendant to stop. He testified that Defendant then ran toward him and Ms. McCray, who was also there. Ms. McCray then pushed the victim's son out of the way causing Defendant to stab her. The victim's son testified that he ran outside to the back of the house to check on the victim through a door that had been kicked in by Sherita Wilson. The door was locked, so the victim's son ran back to the front door and helped Ms. Wilson pull Ms. McCray out of the house. However, they stopped pulling when they got to the livingroom because Defendant walked out into the room. The victim's son then ran to the back of the house to look for his mother. He found her slumped over on the floor.

The victim's son testified that there had been a previous altercation between Defendant and the victim. He said that on January 4, 2009, the family was living in a different house located at 1649 Pinecrest Drive. That morning, he woke up and heard Defendant and the victim arguing. The victim's son testified that he went to their bedroom, and he saw Defendant standing over the victim strangling her. He told Defendant to stop, and Defendant complied. Defendant and the victim then went downstairs, and the victim's son later heard a noise. He went downstairs and saw that Defendant had pushed the victim into a door. Raymond testified that the victim called police, and they took his statement.

Sherita Wilson, the victim's niece and Sherri Holpe's daughter, testified that she was also at the party on February 14-15, 2009. She said that sometime near 12:00 or 1:00 a.m., Defendant got into an argument with "Adam" a.k.a. "Twelve," and Defendant wanted to take his radio back home. Ms. Wilson testified that Defendant then left the party, and the victim went with him. She did not recall if any of the victim's ex-boyfriends were at the party. Ms. Wilson testified that the victim later called on her cell phone and asked Ms. Wilson to bring her a beer. Ms. Wilson took the beer over to the victim and Defendant's house and then returned to the party. She then went to sleep and woke up at approximately 7:00 a.m. to get ready for church. Ms. Wilson heard a loud noise, walked to the front door, and saw Defendant and the victim in the driveway. Defendant was dragging the victim across the street to their house, and the victim was yelling, "Stop." Ms. Wilson saw Defendant drag the victim into the house and slam the door. She said that the door later opened and all of the kids ran out of the house "hollering and screaming." She helped them across the street and then went to the front door of the victim and Defendant's home. Ms. Wilson testified that she saw Ms. McCray in the middle of the floor bleeding and yelling for help. She grabbed Ms. McCray's arms, and the victim's son helped her drag Ms. McCray into the livingroom. She then let Ms. McCray go and ran outside when Ms. McCray told her that Defendant was still in the house. Ms. Wilson testified that she flagged down a passing police officer who radioed for help. While she was waiting for additional officers to arrive, Ms. Wilson testified that she ran around the house and kicked in the back door looking for the victim. She said that the victim was in a corner of the house lying in another one of her son's arms. Ms. Wilson then ran out and told everyone that the victim was dead. Ms. Wilson testified that the victim would sometimes leave Defendant on her own, or he would "put her out." She said that the victim usually stayed with her when she left.

The victim's fifteen-year-old son testified that he went to the party at approximately 11:00 p.m. to get the children staying at the victim's and Defendant's house something to eat. After they ate, he and the children went to sleep, and he woke up at 7:00 a.m. The victim's son testified that the victim was still across the street at his aunt's house, and Defendant was at home. He said that he walked over to his aunt's house and talked to the victim. The victim's son testified that he was at the house approximately fifteen minutes when Defendant

-7-

showed up and told the victim to "come here", and she told him "no." Defendant then grabbed the victim by her arm and drug her out of the house. The victim's son testified that the victim and Defendant stopped and then went out the gate, and "everybody was arguing and then they went across the street." He followed behind them but Defendant took the victim into the house, slammed the door twice, and locked it. The victim's son testified that he ran to the back door but it was also locked. He could see the victim and Defendant wrestling, and he saw Defendant hold the victim's head down and slash her across the face. The victim's son testified that he also saw Defendant stab Ms. McCray in the arm, and she fell.

The victim's son testified that Defendant then said, "I got to go, I got to go," and he ran out of the house. The victim's son said that he ran around to the front door, went inside the house and found the victim in a corner. He was holding the victim when Ms. Wilson kicked in the back door.

The victim's son testified concerning a previous altercation between the victim and Defendant. He said that on January 4, 2009, he was sleeping on the couch downstairs when he woke up and heard arguing. He said that the victim had walked downstairs, and Defendant followed her. The victim's son testified that the victim went into the kitchen and started making a sandwich. He said that Defendant also went into the kitchen, and he and the victim began "tussling and wrestling each other." The victim's son testified that he later heard a loud "boom," and he saw Defendant twisting the victim's arm and choking her. He said that Defendant then let the victim go and left. The victim called police, and Defendant was later arrested. The victim's son noted a point in time when the victim was not living in the home because Defendant had "put her out." He further testified that the victim previously lived in Mississippi for a while, and he lived with his grandmother. Concerning Defendant and the victim's relationship, the victim's son testified:

> Well, my mom used to always go out and she would always ask him to come with her, but he wouldn't go, because he always thought that she was cheating on him. So she asked him to go out with her, so she could show him that she was [not] cheating on him, but he wouldn't believe it. That's why he was upset.

Sherrie Manning testified that she had known Defendant and the victim for eighteen years. She said that Defendant helped raise all of the victim's children, and she noted that the victim left once for an extended period of time. Ms. Manning testified that she arrived at the party on February 14, 2009, at approximately 11:30 p.m. to midnight. She began dancing with Defendant at some point, but he walked away when she was turned around. She said that there was some "sort of noisy commotion," and she saw a beer can fly up in the air,

but she did not know where it came from. Ms. Manning testified that she then saw Defendant talking to Randy Wilson, the victim's cousin, and many people were gathered around them. Ms. Manning testified that Defendant was then asked to leave the party because he would not calm down. She followed Defendant out the door and asked him what was wrong. Ms. Manning testified that Defendant indicated that Randy Wilson was "disrespecting him" because Mr. Wilson said something to the victim or had whispered something in her ear. She said that Defendant also indicated that the victim had been sleeping with Mr. Wilson. Ms. Manning testified that Defendant grabbed her face and said, "They [sic] going to stop playing with him, he's going to show them."

Ms. Manning testified that she told Defendant that he needed to discuss the matter with the victim. She said that she asked the victim to come outside and talk to Defendant. The two talked, and the victim eventually went home with Defendant between 3:00 and 4:00 a.m. Ms. Manning testified that Defendant had indicated that he was no longer welcome at the party. Ms. Manning testified that police were called to the party after 4:00 a.m. and advised them to turn off the radio. The party continued, and the victim eventually returned. Ms. Manning testified:

> I left the party about 6:00, right around 6:00 because I was telling her when I came out of the room from talking to Sherri and I saw [the victim] over there talking to my daughter and her niece and I was like, "Where's Raymond at?" And she said, "Oh girl he's done calmed down now, he's in there laying down, he's got to go to work in a couple of more."

Ms. Manning testified that she received a call about the victim's death within a few hours after arriving home.

Sergeant William Merritt participated in the investigation of the present case. He first went to the Methodist Central Hospital and spoke with Sharese McCray, who had been stabbed. He was then directed to a home at 3222 Estes Street in an attempt to locate Defendant. Defendant was not there when Sergeant Merritt initially arrived, but he returned forty-five minutes later, and Defendant was there. Defendant was then taken into custody and transported to the homicide office. Sergeant Merritt testified that Defendant was advised of his rights and he gave a statement. Sergeant Merritt also collected Defendant's clothing. He said that Defendant had a small cut or abrasion on the right side of his palm. He also said that Defendant did not appear to be intoxicated or under the influence at the time of his statement.

Sergeant Mundy Quinn also participated in the investigation. He went to the scene at 2971 Semmes, located witnesses, and had them transported to the Homicide Bureau. He

said that Defendant was also located and transported there. Sergeant Mundy interviewed Defendant and took his statement. Defendant admitted to stabbing the victim. He said:

> I was the only one who had a job and a working car. Had run through the house and I had no one to help me fix the house. I was under a lot of stress. Last night [the victim] was across the street at a party and her ex-boyfriend was there.

Defendant told Sergeant Mundy that he and the victim had both been drinking earlier in the evening. Concerning the party, Defendant said:

> We was at a Valentine's party across the street at her sister's house, Sherri and alcohol was consumed. [The victim's] ex-boyfriend was at the party. We went to the party around 10:00 p.m. and we were there until late hours of the early morning. I came home to get some sleep before I went to work. When I woke up she was back at the party and I went back over to the party and got [the victim] and we came back to the house and had some words and it escalated and the next thing I know I had a knife in my hand, but I really don't know how the knife got in my hand. The knife was in my hand and my wife was gone. I left the house and went riding and later in the day I drove over to my brother's house. I don't know what time it was. My brother told me the police had just left his house and I told him to go ahead and call the police back.

He did not know what he did with the knife.

Dr. Marco Ross performed an autopsy on the victim. He determined that the cause of her death was multiple stab wounds, and the manner of her death was homicide. Dr. Marco noted that the victim had nine stab wounds to her chest, one stab wound to her abdomen, and "five sharp force injuries of the head and neck, which consisted of four stab wounds and one incised wound." He testified that the most significant of the wounds included one stab wound over the right clavicle and a cluster of three stab wounds over the area of the left clavicle. He noted that the stab to the right clavicle perforated the subclavian artery that supplied blood to the arm, and it pierced the victim's right lung. Dr. Marco testified that the three wounds to the victim's left clavicle perforated the left subclavian artery and pierced her left lung. He said that a stab wound to the victim's abdomen pierced the inferior vena cava, which was responsible for bringing blood back from the lower extremities to the heart. Dr. Marco testified that one of the stab wounds to the victim's head passed through her right eye, "through the skull behind the eye, the bone of the orbit behind the right eye and penetrated, partially, into the brain on the right side." He noted that the victims' blood alcohol level corresponded to a breathalyzer level of 0.18.

-10-

Officer Albert Parks of the Memphis Police Department testified that he was dispatched to 1649 Pinecrest on January 4, 2009, on an "armed party, domestic violence call." He and Officer Isaac Coleman arrived at the residence between 3:50 and 3:56 a.m. and spoke with the victim who said that she had been assaulted by Defendant. The victim's six children were also present when they spoke to the victim, and two of her sons later gave statements. Officer Parks testified that the victim advised them that Defendant had left the scene and had gone to 2971 Semmes Street. Officer Parks and Officer Coleman drove to the address, got Defendant into the patrol car, and transported him back to the scene.

Concerning the assault, the victim told the officers that she and Defendant had been drinking and while they were upstairs, he accused her of cheating on him. She said that he grabbed her around the neck and began chocking her, and he grabbed her wrist. The victim told them that she went downstairs to the kitchen once Defendant released her and began making a sandwich using a knife. She said that Defendant grabbed her wrist and throat again, and he "pushed her into a door that had the panels on it and behind that door was a heating unit. . ." Officer Parks noted that the panels on the door had been broken from where the victim said that Defendant pushed her into the door. Officer Parks and Officer Coleman did not observe any physical injuries to the victim and offered her transportation to another location or medical treatment, but she refused and signed a "hold harmless form."

Sherri Holpe was recalled as a witness by the defense. On cross-examination, she testified that the victim's relationship with Defendant began in the early 1990's when the victim was fourteen years old. At that time, Defendant's grandmother had passed away, and Defendant drove Ms. Holpe and the victim to his grandmother's gravesite in Byhalia, Mississippi. Ms. Holpe said that Defendant walked over to his grandmother's grave and cried. He then walked back to the car, pulled out a gun, pointed it at the victim, and said, "You're going to make me kill you." Ms. Holpe testified that Defendant put the gun back down and began to cry again. He then drove back to Memphis, Tennessee at a high rate of speed. Ms. Holpe testified that the victim and Defendant were married during the last two years of their relationship.

Ms. Holpe testified that she was at a family gathering on another occasion at Defendant and the victim's residence on 2971 Semmes when everyone got into the hot-tub. She said that Defendant unplugged the hot-tub, and the victim plugged it back in. Ms. Holpe testified that Defendant then reached over and "snatched" the victim out of the hot-tub. She said that the victim resisted, and Defendant removed her shirt in front of the family members. He then pulled her into the house, and Ms. Holpe heard them arguing.

Dr. John Hutson, an expert in the field of forensic psychology, testified that he met with Defendant regarding his mental state at the time of the offense. Dr. Hutson testified that

a member of his team met with Defendant on August 31, 2009, and he met with Defendant personally on September 9, 2009, pursuant to a court order. He obtained Defendant's medical records and reviewed "statements from a number of witnesses that was provided by the prosecutor's office. The affidavit of complaint. A previous affidavit of complaint." Dr. Hutson testified that he met with Defendant again on March 18, 2010, pursuant to a court order to look at additional issues.

Dr. Hutson testified that he found Defendant competent to stand trial, but that Defendant suffered from diminished capacity on February 15, 2009, when he killed the victim. He said that in Defendant's case, there were several "issues working or placing undue pressure" on Defendant. More specifically, Dr. Hutson testified:

> The first was, and I'm taking these in terms of longevity. The first one is he lived in a house that was significantly damaged when an automobile accidentally ran into it. They left this house and then they moved back into the house in January of 2009. But, during that time he was reconstructing the house, himself. He took the insurance settlement, he had nothing to do with the automobile as I understand it. But, he worked at Lowe's and had previously worked for lumber companies and he was attempting to rebuild the house, himself. He was living in a house with his children and family, that was basically under construction. That was the first significant stressor.

> The second thing, he was in [a] relationship with a woman, his wife, who he had known for a number of years. Married in 2005. Was raising both his children by her and her children by other men. He was the primary bread winner. She was employed, but he always maintained, at least, one job, if not more, during the course of this time. So he was the primary source of income, which was significant, because of the number of children and stuff involved was a significant stressor for [Defendant].

> Also, in this relationship she tended to leave the relationship, or leave the home on numerous occasions over that twenty-something years, or for about fifteen years, anywhere from a night for years at a time.

> She would either take one, or none of the children, but left the other children, including children which were not his, that he raised and I believe identified him as their father and he would take care of these children.

> This was a stressor to him in the sense that it was unusual that he could not predict when she would leave and when she would come back.

More immediate was at the time of the incident, he was attending a party, he and his wife were both attending a party. It is my understanding, although it has been described to me as across the street, I think it was across the street and may [sic] down a door, or two. This was primarily her family. It was a birthday party for, I think a friend of both of theirs. He provided music and he and his wife, according to [Defendant], acted as bartenders at the party.

An altercation occurred at the party in which he was allegedly, or apparently threatened, but he was assaulted with a beer can. Supposedly two of his [wife's] paramours were at this party and this was a significant stressor.

He and his wife, I believe, and this party is somewhat vague, because there are lots of conflicting reports. But, either he left the party, or he and his wife left the party and went back across the street to their residence. At one point he returned to pick up some of his musical instruments and it may be at that time that he and his wife left the party.

He subsequently wakes up at home to find out his wife is not there, has apparently returned to the party. He goes back to the party and in part because he is due to go to work at Lowe's that morning and apparently wants his wife to come back and be with the children.

It is also not clear to me how many children were in this home at the time. Six children of either his wife's [sic] and his were in the home. There may have been other children that had been parked there for the party. That I could never actually ascertain.

In returning back to the home she apparently refuses, he uses physical force to bring her back and what I call a melee occurs in the street, with other members of the party. He eventually gets his wife in the home, locks the door to keep other people out. An altercation occurs, the people on the outside hears [sic] children screaming, they break into the home, and that's not clear to me either. At which point the witnesses report that [Defendant] and his wife [are] fighting. Some reports that there's a knife, other reports that there is hitting. But, clearly she is stabbed, numerous times. Other people are stabbed. He leaves and she dies.

He leaves and eventually, within a short period he ends up at his brother's house where the police have already been and he tells his brother to call the

-13-

police back, he wants to turn himself in. That is my understanding of the incident.

Dr. Hutson testified that in addition to the stressors, Defendant and the victim were intoxicated at the time of the murder. He also said that Defendant was fatigued "because he wasn't really able to sleep, although he did go back and lay down, because he knew he had to go to work, because he's wondering about where she was and because he was intoxicated." Dr. Hutson testified that all of those factors led "to a deterioration of his judgment at the time" which resulted in diminished capacity. He characterized the factors affecting Defendant as "situational stress."

Dr. Hutson testified that Defendant had never been diagnosed with or treated for depression. However, he felt that Defendant suffered from "at least, dysthymia, which is a level of depression which is not incapacitating, or maybe at times, a more significant depression, he was never incapacitated by depression, though."

## II. Analysis

### I.       Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to support his conviction for first degree murder. More specifically, he argues that at the time of the murder, he "suffered from a diminished psychological capacity which prevented him from forming the requisite intent." He also asserts that the evidence did not establish that the "homicide was premeditated."

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle,* 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect

and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

First degree murder is "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). As used in subdivision (a)(1), "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

### Diminished Capacity

In Tennessee, the doctrine commonly referred to as diminished capacity was first recognized by this Court in 1994. *See State v. Phipps,* 883 S.W.2d 138,149 (Tenn. Crim. App. 1994). After an exhaustive review of authority from sister states and the federal circuits, this Court held that evidence, including expert testimony, on an accused's mental state, is admissible in Tennessee to negate the elements of specific intent, including premeditation and deliberation in a first degree murder case." *Id.* The supreme court summarily agreed with the holding in *Phipps* in *State v. Abrams,* 935 S.W.2d 399, 402 (Tenn. 1996). However, the court did not specifically address the doctrine of diminished capacity until *State v. Hall,* 958 S.W.2d 679 (Tenn. 1997). In *Hall,* the court reviewed the exclusion of expert testimony which the appellant alleged was relevant to negate the essential elements of premeditation and deliberation. *Id.* at 688-692. Similar to the discussion in *Phipps,* the *Hall* court held that evidence of diminished capacity is not admissible to justify or excuse a crime, but instead to prove that a defendant was incapable of forming the requisite mental state, thereby resulting in a conviction of a lesser offense. *See Id.* at 692; *See also State v. Perry,* 13 S.W.3d 724, 734 (Tenn. Crim. App. 1999); *State v. Faulkner*, 154 S.W.3d 48 (Tenn. 2005). The court cautioned against referring to such testimony as proof of diminished capacity. *Id.* at 690. Instead such evidence should be presented to the trial court to negate the existence of the *mens rea* for the charged offense. *Id.*

The standard of admissibility of diminished capacity type evidence was succinctly coined in *State v. Hall,* 958 S.W.2d at 689:

> [T]o gain admissibility, expert testimony regarding a defendant's incapacity
> to form the required mental state must satisfy the general relevancy standards
> as well as the evidentiary rules which specifically govern expert testimony.
> Assuming that those standards are satisfied, psychiatric evidence that the

defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law.

The testimony "*must demonstrate*" that the claimed inability to form the culpable mental state was "*the product of a mental disease or defect,* not just a particular emotional state or mental condition. It is the showing of a lack of capacity to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue." Id. at 690 (emphasis added). "[A]s with most other evidentiary questions, the admissibility of expert opinion testimony is a matter which largely rests within the sound discretion of the trial court." *Id.* at 689.

In this case, Dr. John Hutson found Defendant competent to stand trial, but said that Defendant suffered from diminished capacity on February 15, 2009, when he killed the victim. He said that in Defendant's case, there were several "issues working or placing undue pressure" on Defendant. More specifically, Dr. Hutson testified that Defendant suffered from "situational stress" and found three "stressors" that affected him: (1) living in a house under construction with the children; (2) taking care of all the children with an unpredictable partner; and (3) the incident at the party where Defendant felt threatened by the victim's paramours and/or her family.

Dr. Hutson testified that in addition to the stressors, Defendant and the victim were intoxicated at the time of the murder. He also said that Defendant was fatigued "because he wasn't really able to sleep, although he did go back and lay down, because he knew he had to go to work, because he's wondering about where she was and because he was intoxicated." Dr. Hutson testified that all of those factors led "to a deterioration of his judgment at the time" which resulted in diminished capacity.

Dr. Hutson testified that Defendant had never been diagnosed with or treated for depression. However, he felt that Defendant suffered from "at least, dysthymia, which is a level of depression which is not incapacitating, or maybe at times, a more significant depression, he was never incapacitated by depression, though." A letter by Dr. Hutson, addressed to the court and dated September 9, 2009, contained the following statement:

> With regard to [Defendant's] mental condition at the time of the alleged offense, it is the opinion of the staff that at the time of the commission of the acts constituting the alleged offense(s), severe mental disease or defect did not prevent the defendant from appreciating the nature or wrongfulness of such acts pursuant to T.C.A. § 39-11-501.

A subsequent letter to the trial court dated March 18, 2010, contained the following: "[Defendant] appears to have some diminished capacity at the time of this offense. His functioning was impaired by a combination of intoxication (alcohol), depression, and significant situational stress."

Although Defendant presented proof that his capacity to form premeditation was diminished at the time of the murder, it was the jury's duty to determine the weight given to the evidence. In *Edwards v. State*, 540 S.W.2d 641, 647 (Tenn. 1976), the Supreme Court held:

> In this state, 'it is settled beyond question that the weight and value of expert testimony is for the jury and must be received with caution. *Mullendore v. State*, 183 Tenn. 53, 191 S.W.2d 149. This applies to the expert opinions of medical men. *Crane Enamel Co. v. Jamison*, 188 Tenn. 211, 217 S.W.2d 945. Where there is any conflict between expert testimony and the testimony as to the facts, the jury is not bound to accept expert testimony in preference to other testimony, and must determine the weight and credibility of each in the light of all the facts shown in case. *Act-O-Lane Gas Service Co. v. Clinton*, 35 Tenn. App. 442, 245 S.W.2d 795; *East Tennessee Natural Gas Co. v. Peltz*, 38 Tenn. App. 100, 270 S.W.2d 591. Expert medical opinion regarding the functioning of the human body must always be more or less speculative. *Patterson Transfer Co. v. Lewis*, 195 Tenn. 474, 260 S.W.2d 182; *Great American Indemnity Company v. Friddell*, 198 Tenn. 360, 280 S.W.2d 908.' *Sparkman v. State, Tenn. Cr. App.*, 469 S.W.2d 692, 696 (1970).

Based on the verdict, the jury did not accept the claim that Defendant suffered from diminished capacity at the time of the murder so as to negate the elements of specific intent, premeditation, and deliberation in this case, as was its prerogative. Defendant is not entitled to relief on this issue.

**Premeditation**

The element of premeditation is a question of fact to be determined by the jury. *State v. Davidson,* 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. *State v. Bland,* 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Bordis,* 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our Supreme court has delineated several circumstances that may be indicative of premeditation, including the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, declarations of the intent to kill the victim by the defendant, the making of preparations before the killing for the purpose of

concealing the crime, and calmness immediately after the killing.  *State v. Nichols,* 24 S.W.3d 297, 302 (Tenn. 2000).

Viewing the evidence in the light most favorable to the State, the proof shows that Defendant used a deadly weapon, a butcher knife, to kill the unarmed victim.  The killing was particularly cruel.  According to the medical examiner, the victim had nine stab wounds to her chest, one stab wound to her abdomen, and "five sharp force injuries of the head and neck, which consisted of four stab wounds and one incised wound."  One of the stab wounds to the victim's head passed through her right eye, "through the skull behind the eye, the bone of the orbit behind the right eye and penetrated, partially, into the brain on the right side."

There was testimony that prior to the stabbing, Defendant was involved in an altercation at the party on February 14-15, 2009, with the victim's family/and or an alleged ex-boyfriend and was asked to leave Ms. Holpe's house.  Ms. Manning testified that when Defendant left, he grabbed her face and said, "They [sic] going to stop playing with [me], [I'm] going to show them."  The proof showed that the victim left the party with Defendant and later returned to Ms. Holpe's house.  She told Ms. Manning that Defendant had calmed down and was at home lying down.   The victim later went home to wake Defendant up for work, and she returned to the party.  Defendant then showed up at Ms. Holpe's house, grabbed the victim, and pulled her outside.  He left and then returned to Ms. Holpe's house and pulled the victim out of the house again and into the driveway.  Several people went outside and asked Defendant to leave the victim alone but he continued dragging her across the street and into their house, locking the door behind them.

Once Defendant and victim got into their house, he shoved her, and she ran into a door causing it to fall.  According to the victim's son, she stumbled and landed on her back.  Defendant then ran into the kitchen, obtained a butcher knife, ran back into the bedroom, got on top of the victim, and began stabbing her.  The victim begged Defendant not to kill her in front of her son, and one of the victim's sons told Defendant to stop.  At some point, Defendant grabbed Rosalyn Albright, one of the women who had gotten into the house to help the victim, causing her to fall.  He then stabbed Sharese McCray in the arm.  After stabbing Ms. McCray, Defendant walked by Ms. Albright and Tammy Richmond and told them to get off his property.  The victim's fifteen-year-old son testified that after stabbing the victim, Defendant said, "I got to go, I got to go."  Defendant acted with calmness immediately after the killing.  He left the house, got into his SUV, sat there for a moment, and then drove away.  He later told police that he went riding around after the murder and then drove to his brother's house who told him that police were looking for him.  There had also been a previous threat and incidents of violence between the victim and Defendant.  In January of 2009, police were called to the couple's residence on Pinecrest Drive.  After arguing with the victim, Defendant attempted to choke her, and he pushed her into a door

causing it to break. The victim's sister testified that in the early 1990's, Defendant drove her and the victim to his grandmother's grave in Mississippi. While there, Defendant pulled a gun, pointed at the victim, and said, "You're going to make me kill you." The victim's sister also testified that during a family gathering on another occasion, Defendant "snatched" the victim out of a hot-tub. The victim resisted, and Defendant removed her shirt in front of family members. He then pulled the victim into the house, and the victim's sister heard them arguing.

Based on a thorough review of the record, we conclude that the facts and circumstances as a whole were sufficient for a rational trier of fact to have found the elements of premeditated first degree murder beyond a reasonable doubt. Defendant is not entitled to relief on this issue.

## II.    *Admission of Prior Bad Acts by Defendant Against the Victim*

Next, Defendant argues that the trial court erred by denying his motion in limine and admitting evidence of prior bad acts by Defendant against the victim into evidence. The admission of evidence is a matter within the trial court's discretion, and a decision to admit or exclude evidence will not be disturbed on appeal absent a clear abuse of that discretion. *State v. Carroll,* 36 S.W.3d 854, 867 (Tenn. Crim. App. 1999). Rule 404(b) of the Tennessee Rules of Evidence provides as follows:

> (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person or to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

A fourth prerequisite to admission is that the court find by clear and convincing evidence that the defendant committed the other crime. *State v. Thacker,* 164 S.W.3d 208, 240 (Tenn. 2005) (citing Tenn. R. Evid. 404, Advisory Comm'n Comment; *State v. DuBose,* 953 S.W.2d 649, 654 (Tenn. 1997); *State v. Parton,* 694 S.W.2d 299, 303 (Tenn. 1985)).

While evidence of a prior crime, wrong, or act is not admissible to prove that a defendant had the propensity or disposition to commit the crime, it may be relevant and admissible to prove issues such as identity, intent, motive, opportunity, or absence of mistake or accident. *See State v. Shropshire,* 45 S.W.3d 64, 75 (Tenn. Crim. App. 2000). Where the trial court has been called to pass upon the admissibility of evidence of other crimes, wrongs, or acts under Rule 404(b), its determination is entitled to deference when it has substantially complied with the procedural requisites of Rule 404(b). *Thacker,* 164 S.W.3d at 240 (citing *DuBose,* 953 S.W.2d at 652).

Prior to trial in this case, Defendant filed a motion in limine to exclude evidence of the "events surrounding the arrest of [Defendant] for Domestic Assault in Shelby County." The motion also included any other prior bad acts, crimes, or convictions. At the pretrial hearing on the motion, two of the victim's sons testified that on January 4, 2009, Defendant and the victim were in an argument. The victim's seventeen-year-old son testified that he walked into Defendant and the victim's bedroom upstairs and saw Defendant on top of the victim strangling her. The victim's son told them to stop, and Defendant let go of the victim. The two then went downstairs, and while the victim was holding a knife making a sandwich, Defendant pushed the victim into a door causing it to break. The victim's son testified that he noticed bruises on the victim's neck.

The victim's fifteen-year-old son testified that he was downstairs sleeping on the couch when he heard Defendant and the victim arguing. He said that the victim walked downstairs and was making a sandwich when Defendant followed her into the kitchen. The victim's son testified that Defendant and the victim began "tussling with each other by hand," and the victim then "got leaned over towards the washing machine and then got pushed back." He further testified that he saw Defendant choking the victim and "then twisting her arm and then pushed her into the heating machine, or whatever it was, in the kitchen." The victim's son testified that the victim's arm was swollen and had bruises on it. Defendant was later taken into custody by police.

In holding that the evidence would be admissible at that time, the trial court stated:

What I am presented with is a statement that there's evidence of other crimes. That is what I am told, as Judge, that there is evidence of other crimes.

What I have heard in a nutshell is that an assault occurred upstairs. The young man testified that his father was on top of his mother choking her, that is an assault.

The second young man testified that the father assaulted the mother, downstairs, that's an assault.

What he has testified to is characterized by the law as an assault. Now, it is not my position to determine the truthfulness of that testimony.

I don't weigh their credibility in determining whether or not there's evidence of assault. The jury will have to make that determination as to their credibility. They are subject to cross examination in the presence of the jury, whether to the inconsistencies, or conflicts in their testimony and all of that.

But, what I am told is that there is evidence of other crimes and I ordered the jury to leave the room so that we could make that determination. The question, of course, before the Court is whether or not that is a material issue, other than character traits. And I am told that there is evidence of other crimes.

And what I have heard is evidence of other crimes. That this man choked his wife upstairs and did some things to her downstairs. I find at this stage of the proceedings, in spite of the argument of [defense counsel], which is an excellent argument. That is an excellent jury argument, but what I am told is that there's evidence of two assaults and I find that there is proof of two assaults. And the question is, whether or not the probative value of those assaults outweigh the prejudicial value.

That is what is confronting this Court, whether or not this evidence is outweighed by the danger of unfair prejudice.

Well, let me for the record, let me tell you what I will be charging the jury. I'll tell the jury this, and I am going to find - I am going to overrule your motion to exclude this testimony. But I am going to tell the jury this;

"If you find that the defendant has committed the crime other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial. This evidence may only be considered by you for the limited purpose of determining whether it provides (a), the complete story of the crime. That is, such evidence may be considered

by you for the prior crimes and the present alleged crime are logically related, or connected, or a part of the same transaction, so that proof of others tends [sic] are necessary to prove the one charged, or necessary for the completed count, thereof.

The defendant's identity. Such evidence may be considered by you if it tends to establish the defendant's identity.

A scheme or plan. That is, such evidence may be considered by you if it tends to establish that the defendant engaged in a common scheme or plan for the commission of two or more crimes so related to each other that proof of one tends to establish the other.

Motive."

Which [the prosecutor] has presented.

"Such evidence may be considered by you if it tends to show a motive of the defendant for the commission of the offense; and

Intent. Such evidence may be considered by you if it tends to establish intent.

Guilty knowledge."

I will make it very plain that evidence of other crimes, if considered by you at all, for any purpose other than that specifically stated.

So that is that I am going to tell the jury and try to make it perfectly clear that evidence of two assaults does not indicate guilt of the crime for which we are trying.

And under those circumstances I am going to allow the testimony.

Now, I might also point out that this testimony is subject to the credibility test. You have the right to cross-examine them, relative to prior inconsistent statements. You have the right to cross-examine them as to whether or not one is saying something different from what he said in the past. You have a right to cross-examine them relative to what the police concluded in an affidavit.

Additionally, when Sherri Holpe was recalled as a witness by Defendant, the State notified the trial court of the following:

> Your Honor, we've been made aware of some information this morning that we would bring to the Court in a form of an amended 404B motion, prior bad acts. To show [Defendant's] intent and a reason to harm [the victim]. There is a long history of violence by [Defendant] against [the victim], which we were previously unaware of, but which this witness and other family members are aware of.

In a jury-out hearing, Ms. Holpe testified that in the early 1990's, Defendant drove her and the victim to his grandmother's gravesite in Mississippi. At that time, he placed a gun to the victim's head and said something to the effect, "that he would put her there, also[.]" Ms. Holpe also testified that during a family gathering, Defendant pulled the victim out of a jacuzzi or hot-tub because he was angry that everyone was in there. The trial court ruled that the State could cross-examine Ms. Holpe about the two events. Ms. Holpe also testified as to other acts by Defendant, but the trial court did not allow the evidence of those acts to be admitted into evidence.

At trial, Ms. Holpe went on to testify that the victim's relationship with Defendant began in the early 1990's when the victim was fourteen years old. At that time, Defendant's grandmother had passed away, and Defendant drove Ms. Holpe and the victim to his grandmother's gravesite in Byhalia, Mississippi. Ms. Holpe said that Defendant walked over to his grandmother's grave and cried. He then walked back to the car, pulled out a gun, pointed it at the victim, and said, "You're going to make me kill you." Ms. Holpe testified that she was at a family gathering on another occasion at Defendant and the victim's residence on 2971 Semmes when everyone got into the hot-tub. She said that Defendant unplugged the hot-tub, and the victim plugged it back in. Ms. Holpe testified that Defendant then reached over and "snatched" the victim out of the hot-tub. She said that the victim resisted, and Defendant removed her shirt in front of the family members. He then pulled her into the house, and Ms. Holpe heard them arguing.

The trial court properly admitted evidence of the January 4, 2009, incident, and the testimony by Ms. Holpe as it demonstrates Defendant's motive and intent, and it rebuts Defendant's testimony that he acted without premeditation. Under *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993), when there are prior bad acts which indicate the relationship between the defendant and the victim of a violent crime, these prior violent acts are relevant to show the defendant's hostility toward the victim, the defendant's malice, the defendant's intent, and the defendant's "settled purpose" to harm the victim. *See also State v. Turnbill*, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982); *State v. David Kyle Gilley*, No. M2006-

02600-CCA-R3-CD, 2008 WL 3451007 (Tenn. Crim. App. Aug. 13, 2008)(*perm to app. denied* Feb. 17, 2009).

Based on the foregoing, we conclude that the evidence was probative of both Defendant's motive and intent and to rebut his claim of lack of premeditation. Although the evidence was prejudicial, based on our review of the facts presented in this case, we conclude that the probative value was not outweighed by the danger of unfair prejudice. Accordingly, this evidence was properly admitted.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE